AO 91 (Rev. 11/11) Criminal Complaint

DOJ Fraud Section Trial Attorney Jeffrey Le Riche (202) 514-9247

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EDWARD BASES and
JOHN PACILIO

CASE NUMBER:
**UNDER SEAL**

# 18CR 48

**MAGISTRATE JUDGE WEISMAN**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about June 2010 through in or about April 2014, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant EDWARD BASES violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1348(1) and 2 | Defendant knowingly, and with the intent to defraud, executed, and attempted to execute, and willfully participated in, a material scheme and artifice to defraud a person in connection with a commodity for future delivery. |
| Title 7, United States Code, Sections 6c(a)(5)(C), 13(a)(2), and 13c(a) | Defendant knowingly engaged in trading, practice, and conduct on or subject to the rules of a registered entity – COMEX – that was "spoofing," that is, bidding and offering with the intent, at the time the bid or offer was entered, to cancel the bid or offer before execution. |

From in or about January 2010 through in or about April 2011, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant JOHN PACILIO violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1348(1) and 2 | Defendant knowingly, and with the intent to defraud, executed, and attempted to execute, and willfully participated in, a material scheme and artifice to defraud a person in connection with a commodity for future delivery. |

# RECEIVED

JAN 2 5 2018

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

# FILED

JAN 25 2018

M. DAVID WEISMAN
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

This criminal complaint is based upon these facts:

    __X__   Continued on the attached sheet.

A. WESLEY NEVENS
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: *Jan. 25, 2018*

*Judge's signature*

City and state:  __Chicago, Illinois__

HON. M. DAVID WEISMAN, U.S.M.J.
*Printed name and Title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, A. WESLEY NEVENS, being duly sworn, state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Chicago Field Division. I have been employed by the FBI as a Special Agent since 2010. During my tenure with the FBI, I have received training in the investigation of financial crimes and in financial analysis. As part of my duties as a Special Agent, I have investigated criminal violations relating to complex corporate fraud. During my career, I have been the affiant on applications for search warrants and arrest warrants in federal criminal investigations.

2.  I submit this Affidavit in support of a criminal complaint and arrest warrants for:

    a.  EDWARD BASES ("BASES") for: (i) commodities fraud, in violation of Title 18, United States Code, Sections 1348(1) and 2; and (ii) spoofing, in violation of Title 7, United States Code, Sections 6c(a)(5)(C), 13(a)(2), and 13c(a); and

    b.  JOHN PACILIO ("PACILIO") for commodities fraud, in violation of Title 18, United States Code, Sections 1348(1) and 2.

3.  For the reasons set forth below, there is probable cause to believe that on or about certain days beginning in or around at least June 2010 and

1

continuing until in or around at least April 2014[1], BASES, along with others, in the Northern District of Illinois, Eastern Division, and elsewhere:

       a.    knowingly, and with the intent to defraud, executed, and attempted to execute, and willfully participated in, a material scheme and artifice to defraud participants in the market for futures contracts for gold, silver, platinum, and palladium (the "precious metals futures contracts") on the Commodity Exchange, Inc. ("COMEX"), all of which were commodities for future delivery, in violation of Title 18, United States Code, Sections 1348(1) and 2[2]; and

       b.    knowingly engaged in trading, practice, and conduct on and subject to the rules of a registered entity, namely COMEX, that was "spoofing," that is, bidding and offering with the intent, at the time the bid or offer was entered, to cancel the bid or offer before execution, in violation of Title 7, United States Code, Sections 6c(a)(5)(C), 13(a)(2), and 13c(a).[3]

---

[1]    On December 20, 2016, Chief Judge Rubén Castillo of the United States District Court for the Northern District of Illinois, issued an order pursuant to 18 U.S.C. § 3292 (the "tolling order") suspending the running of the statute of limitations as to, among other charges, the commodities fraud and spoofing charges alleged herein, to permit the United States to obtain foreign evidence from the United Kingdom. The tolling order suspends the running of the statute of limitations for such charges from December 9, 2016 until the earlier of three years or such time as the United Kingdom takes final action on the requested assistance, which has not occurred at the time of this Affidavit. *See* Order, 16 GJ 1224 (Dec. 20, 2016); 18 U.S.C. § 3292.

[2]    The Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted on May 20, 2009, expanded the anti-fraud provisions of the federal securities fraud statute, 18 U.S.C. § 1348, to apply to fraud involving commodities options and futures. *See* FERA § 2(e)(1), Pub. L. 111-21, 123 Stat. 1618.

[3]    Congress enacted the anti-spoofing provision, 7 U.S.C § 6c(a)(5)(C), as an amendment to the Commodity Exchange Act, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which became effective on July 16, 2011. *See* Dodd-Frank Act §§ 747, 754; *see also, e.g.*, Antidisruptive Practices Authority Contained in the Dodd-Frank Wall Street Reform and Consumer Protection Act, 75 Fed. Reg. 67301-01, 67302 (Nov. 2, 2010). Accordingly, the Dodd-Frank-Act "spoofing" offenses described herein relate only to conduct by BASES and his accomplices *after* July 16, 2011.

4.    For the reasons set forth below, there is probable cause to believe that on or about certain days beginning in or around at least January 2010 and continuing until in or around at least April 2011, PACILIO, along with others, in the Northern District of Illinois, Eastern Division, and elsewhere, knowingly, and with the intent to defraud, executed, and attempted to execute, and willfully participated in, a material scheme and artifice to defraud participants in the market for precious metals futures contracts on the COMEX, all of which were commodities for future delivery, in violation of Title 18, United States Code, Sections 1348(1) and 2.

5.    The information supplied in this Affidavit is based upon: (a) my personal knowledge and observations; (b) my discussions with other law enforcement officers who have assisted in the investigation; (c) my training and experience; (d) my review of certain information obtained from witnesses, including Bank A Trader #1, whose identity is known to Your Affiant as described more fully below; (e) my review of documents and records obtained by the FBI during the investigation; and (f) analysis of trading data presently available and related information obtained by the FBI in connection with the investigation.

6.    This Affidavit is being executed as part of an ongoing investigation and is based on my current understanding of the relevant facts based on the above.  As the investigation proceeds, new facts may come to light that qualify or contradict prior facts.  Because this Affidavit is being submitted

3

for the limited purpose of establishing probable cause for the criminal complaint and arrest warrants, Your Affiant has not included each and every fact known concerning this investigation. Your Affiant has set forth only the facts that I believe are necessary to establish that there is probable cause to believe that BASES has violated: (i) Title 18, United States Code, Sections 1348(1) and 2; and (ii) Title 7, United States Code, Sections 6c(a)(5)(C), 13(a)(2), and 13c(a); and that PACILIO has violated Title 18, United States Code, Sections 1348(1) and 2.

## BACKGROUND

7.     During the relevant time period, Bank A and Bank B, whose identities are known to Your Affiant, together with their subsidiaries and affiliates, were two of the largest global banking and financial services companies in the world. Bank A and Bank B each had operations in the United States, Europe, Asia-Pacific, and other locations. Bank A and Bank B each operated global commodities trading businesses that included the trading of precious metals futures contracts. Both Bank A's and Bank B's primary precious metals futures trading desks were located in the United States, the United Kingdom, and the Republic of Singapore.

8.     From approximately July 2008 until approximately June 2010, BASES was employed as a precious metals trader at Bank A, and was based in New York, New York. From approximately June 2010 until approximately November 2015, Bases was employed as a precious metals trader at Bank B,

4

and was based in New York, New York. At all relevant times, BASES traded precious metals futures contracts in his capacity as a precious metals trader at Bank A and Bank B, respectively.

9. From approximately October 2007 until approximately June 2011, PACILIO was employed as a precious metals trader at Bank B, and was based in New York, New York. At all relevant times, PACILIO traded precious metals futures contracts in his capacity as a precious metals trader at Bank B.

10. The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including COMEX, which was based in New York, New York. At all relevant times, COMEX was a registered entity, operating as a Designated Contract Market. COMEX utilized an electronic trading system called "Globex."

11. Globex was a global electronic trading platform operated by the CME Group, which utilized computer servers located in Chicago and Aurora, Illinois, within the Northern District of Illinois. Trading on Globex was conducted electronically using a visible "order book" that displayed quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels."[4] Globex allowed market

---

[4] In order to trade futures contracts on the Globex platform, a trader must utilize a unique identifier called a "Tag 50" that is used to connect a particular market participant with a specific order, modification, or cancellation placed on the CME. The analysis of trading data discussed in this Affidavit relates to activity by specific Tag 50 identifiers known to Your Affiant to be associated with BASES and PACILIO, respectively, to place orders, cancellations, and trades for precious metals futures contracts.

participants to trade futures contracts either at the exchange itself or from a location virtually anywhere in the world. Through Globex, markets operated by the CME Group offered trading opportunities in futures contracts for various commodities, including precious metals futures contracts.

12. COMEX, through the Globex system, allowed traders to place orders in the form of "bids" to buy or "offers" to sell a futures contract. The minimum price increment at which a futures contract could trade on COMEX was called a "tick," and the value of a tick for each contract was set by COMEX. At any given time, the market for a given futures contract comprised the prevailing best (*i.e.*, highest) bid and prevailing best (*i.e.*, lowest) offer. The difference between the best bid and the best offer was the "spread." An order was "filled" or "executed" when a buyer and seller bought and sold a particular contract, with either the buyer "crossing the spread" to buy at the prevailing best offer, or the seller crossing the spread to sell at the prevailing best bid.

13. A futures contract was a standardized, legally binding agreement that, once executed, obligated the parties to the contract to buy or to sell a specific product or financial instrument in the future. That is, the buyer and seller of a futures contract agreed on a price today for a product or financial instrument to be delivered (by the seller), in exchange for money (to be provided by the buyer), on a future date. Futures contracts traded on set, periodic expiration cycles (*i.e.*, monthly or quarterly).

14. Futures contracts were traded on markets designated and regulated by the Commodity Futures Trading Commission (the "CFTC"), the federal agency established by statute to regulate, among many other things, transactions related to and involving the purchase and sale of futures contracts.

15. Gold, silver, platinum, and palladium futures contracts were contracts for the delivery of gold, silver, platinum, and palladium, respectively, in the future at an agreed-upon price. The gold, silver, platinum, and palladium futures contracts were traded on the COMEX, using the Globex system.

16. Based on my training and experience and information gathered during this investigation, Your Affiant has learned that:

    a.    "Spoofing" was the unlawful practice of bidding or offering with the intent, at the time the bid or offer was placed, to cancel the bid or offer before it is executed. Spoofing could be used as a method to engage in market manipulation and deception.

    b.    One of the many ways that spoofing could be used as a form of market manipulation and deception was as follows:

        i.    A trader places on one side of the market one or more genuine orders either to buy or to sell futures contracts that the trader intends to execute (the "Primary Orders").

        ii.    At or near the same time that the Primary Orders are placed, the same trader or his accomplice also places orders, of a much greater visible quantity, either to buy or to sell futures contracts on the opposite side of the market, which orders the trader, by contrast, intends, at the time the orders are

7

placed, to cancel before they are executed (the "Spoof Orders").

iii.    By placing the Spoof Orders, the trader intends to create a market imbalance in the visible order book, injecting false and misleading information (*i.e.*, orders the trader does not intend to execute) into the market to create the false impression of increased supply or demand.

iv.    This false and misleading information may, and often does, cause other market participants to buy and to sell futures contracts at prices (including by crossing the spread), and at quantities, and at times, that they otherwise would not because, among other things, market participants react to the apparent (although artificial) increase in supply or demand that might, and often does, affect futures contract prices.

v.    When the trader who places Spoof Orders induces enough market participants to buy or to sell futures contracts at a price, quantity, or time that they otherwise would not have traded, the price of a given futures contract may change, resulting in the creation of a new, but artificially inflated or deflated, price. When the new artificial price has changed enough, the trader's Primary Orders trade at prices, at quantities, and at times that otherwise would not have been available, but for the Spoof Orders.

## SUMMARY OF THE INVESTIGATION

### Overview of the Scheme to Defraud and Spoofing Practice

17.    The FBI has been investigating the existence of materially deceptive trading activity in the markets for certain precious metals futures contracts by, among others, BASES, PACILIO, and other precious metals traders at Bank A and Bank B.

8

18.     Based on information obtained by the FBI during the investigation, which is discussed in more detail below, Your Affiant has learned that on certain days beginning in or around at least January 2010 and continuing until in or around at least April 2014, in the Northern District of Illinois, Eastern Division, and elsewhere, BASES, PACILIO, and their accomplices (a) devised, executed, and participated in a scheme to defraud other market participants, and (b) engaged in the practice of spoofing, all in connection with precious metals futures contracts, all of which were financial products traded on the COMEX exchange.

19.     Specifically, based on documents and communications obtained by the FBI and an analysis of market-depth, trade, and order data performed during the investigation, Your Affiant has learned that BASES, PACILIO, and their accomplices placed one or more fully visible large Spoof Orders for precious metals futures contracts on one side of the market which, at the time BASES, PACILIO, and their accomplices placed the orders, they intended to cancel before execution. The purpose of these Spoof Orders was to trick other market participants by injecting materially misleading information into the market that indicated increased supply or demand, but was not genuine because BASES, PACILIO, and their accomplices never intended to execute the bids or offers contained in these Spoof Orders. This, in turn, was intended to induce and often did induce market participants to buy or to sell precious metals futures contracts at prices, at quantities, and at times that they would

9

not have otherwise. While the Spoof Orders were pending, and in those instances when the Spoof Orders caused or assisted in causing price movements, BASES, PACILIO, and their accomplices often executed Primary Orders of smaller visible quantities on the opposite side of the market in an attempt to profit, mitigate losses, or otherwise benefit from the artificial movement in price that they had caused or assisted in causing.

BASES Engaged in the Scheme to Defraud and Spoofing Practice at Bank A

20.     Based on documents and communications obtained by the FBI during the investigation and an analysis of market-depth, trade, and order data performed during the investigation, there is probable cause that BASES placed Spoof Orders in the markets for precious metals futures contracts during his tenure at Bank A and well knew that the practice of spoofing was deceptive and manipulative.

21.     For example, on or about January 28, 2009, BASES engaged in a chat conversation with another precious metals trader from Bank A ("Bank A Trader #2").[5] Based on this communication and an analysis of trade and order data corresponding to the time of this chat, there is probable cause that BASES placed numerous orders to buy gold futures contracts in an effort to facilitate the execution of Bank A Trader #2's Primary Order to sell gold futures contracts.

---

[5]     The identity of Bank A Trader #2 is known to Your Affiant.

10

a. Specifically, at approximately 7:37:16.108[6] Bank Trader #2 placed an iceberg[7] order with one visible lot to sell 170 gold futures contracts at $892.50 (the Primary Order). After approximately 5 and a half minutes, none of Bank A Trader #2's iceberg order to sell had been filled. At approximately 7:42:51.670, BASES placed a non-iceberg visible order to buy 250 gold futures contracts at $890.80, which he canceled in less than 2 seconds without any of it being executed. In addition, from approximately 7:42:51.903 to approximately 7:46:41.245, BASES proceeded to place 240 individual non-iceberg orders opposite the Primary Order to buy 10 gold futures contracts at various prices between $890.80 and $892.40, all of which were fully visible to the market, and quickly canceled each order before any were executed. At approximately 7:43:35.921, Bank A Trader #2's Primary Order began to be filled and by approximately 7:47:15.551, Bank A Trader #2 had successfully filled all 170 lots of his Primary Order.

b. Immediately following the trading activity described above with BASES's placing and canceling the non-iceberg buy orders without any being filled, BASES and Bank A Trader #2 engaged in the following chat conversation[8]:

> BASES: that does show u how easy it is to manipulate it soemtimes.
>
> Bank A Trader #2: yeah yeah of course ,
>
> BASES: that was alot of clicking

---

[6] All times in this Affidavit are approximate and are in Central Time, based on a 24-hour clock.

[7] An "iceberg" order was a type of order that traders could place when trading precious metals futures contracts on the COMEX. In an iceberg order, the total amount of the order was divided into a visible portion of a certain pre-set quantity that was visible to other market participants, and a portion of the order (*i.e.*, the remainder of the order) that was not. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the entire remainder of the order was either executed or canceled.

[8] All typographical errors are original to the document quoted.

11

> Bank A Trader #2:  basically you tricked alkll the algorythm
>
> BASES:  good man. Correct.i know how to "game" this stuff...
>
> Bank A Trader #2:  THAT IS BRILLIANT
>
> BASES:  I just dotn have the time to do it.. but i do it alot in the aftermarkete. i f..k the mkt around a lot. not alot of people... had it figgied out.. thats why i love electronic trading.
>
> BASES:  im just glad we got u out...

22.     On June 1, 2017, Bank A Trader #1, pleaded guilty, pursuant to a plea agreement with the U.S. Department of Justice ("DOJ"), to a criminal information charging Bank A Trader #1 with one count of conspiracy, in violation of Title 18, United States Code, Section 371, to commit: (a) wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343; and (b) spoofing, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).[9]

---

[9]     Pursuant to Bank A Trader #1's plea agreement, Bank A Trader #1 has agreed, among other things, to cooperate fully with the DOJ and to provide the DOJ with complete and truthful information. Pursuant to the plea agreement, the DOJ has agreed, among other things, that, at the time of sentencing, the government shall make known to Bank A Trader #1's sentencing judge the extent of defendant's cooperation. If the government determines that Bank A Trader #1 has provided full and truthful cooperation as required by his/her plea agreement, and has rendered substantial assistance, then the government shall move the Court, pursuant to United States Sentencing Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range. Except as set forth in the plea agreement, the DOJ has further agreed not to initiate further criminal charges against Bank A Trader #1 based on conduct set forth in the criminal information and plea agreement.

23. According to Bank A Trader #1, and based on training and instruction provided to him/her by others, including Bank A Trader #2, Bank A Trader #1 personally engaged in a deceptive trading strategy on numerous occasions between the approximate time period of December 2009 to February 2012. According to Bank A Trader #1, he/she and others at Bank A, including Bank A Trader #2, would typically (a) place an "iceberg" Primary Order on one side of the market and then (b) place one or more bids or offers, which were not icebergs and therefore showed a large fully visible quantity, on the opposite side of the market, close to (typically within five ticks of) the best bid or offer, which opposite orders were canceled typically within five seconds of their placement (the "Deceptive Strategy").

24. According to Bank A Trader #1, he/she learned from others at Bank A, including Bank A Trader #2, to engage in the Deceptive Strategy by implementing patterns of order and trade activity in precious metals futures contracts markets including the following:

      a.    First, Bank A Trader #1 would place a Primary Order, using iceberg functionality, on one side of the market close to the prevailing price at which that precious metals futures contract was trading;

      b.    Second, after placement of the Primary Order and while the Primary Order was pending, Bank A Trader #1 would place one or more fully visible orders opposite the Primary Order of at least 10 lots, without using iceberg functionality, on the opposite side of the market from the Primary Order and close to—*i.e.*, typically within five ticks of—the prevailing price at which that given precious metals futures contract was trading ("Opposite Orders");

c.   Third, Bank A Trader #1 would quickly cancel his/her Opposite Order, typically within five seconds after placing the Opposite Order and before the Opposite Order could be executed; and

d.   Fourth, often, but not always, at least one lot of Bank A Trader #1's Primary Order would be filled before the Opposite Order was canceled.

25.   I have reviewed an analysis of the market-depth, trade, and order data obtained in the investigation to identify instances of the pattern of trading activity summarized above in Paragraph 24, in which at least one lot of BASES's Primary Order was filled before an Opposite Order was canceled. This analysis shows that BASES, while at Bank A, engaged in a pattern of trading activity consistent with the Deceptive Strategy, in which at least one lot of BASES's Primary Order was filled before an Opposite Order was canceled, over one hundred times, placing thousands of Opposite Orders.[10]

BASES and PACILIO
Engaged in the Scheme to Defraud and Spoofing Practice at Bank B

26.   Based on documents and communications obtained by the FBI during the investigation and an analysis of market-depth, trade, and order data performed during the investigation, there is probable cause that BASES and PACILIO placed Spoof Orders in the markets for precious metals futures

[10]   These approximate summary figures are based on an analysis to date of available RAPID order message data and ARMADA market-depth data obtained from the CME Group. The data analysis is ongoing, and these approximate summary figures may change as additional data covering the relevant time period is obtained.

contracts during their respective tenures at Bank B and that each individual well knew that the practice of spoofing was deceptive and manipulative.

BASES and PACILIO Engaged in<br>Both Solo and Coordinated Spoofing at Bank B

27. As part of their scheme to defraud and spoofing practice, BASES and PACILIO engaged in the spoofing practice by themselves ("solo spoofing") and with other precious metals traders at Bank B, including Bank B Trader #1[11] ("coordinated spoofing"), all in furtherance of the scheme to defraud. When engaged in solo spoofing, either BASES or PACILIO would place Spoof Orders individually in order to facilitate the execution of his own Primary Orders and without the placement of any Spoof Orders by the other or by other traders at Bank B. By contrast, coordinated spoofing involved one or more additional participants. When engaging in coordinated spoofing, BASES, PACILIO, and/or one or more other Bank B traders would place one or more Spoof Orders on one side of the market in order to facilitate the execution of Primary Orders placed on the opposite side of the market by either BASES, PACILIO, or another Bank B trader.

BASES's Personal Execution of the<br>Scheme to Defraud and Spoofing Practice at Bank B

28. Based on evidence obtained by the FBI during the investigation, beginning in or around at least June 2010 and continuing until in or around at least April 2014, BASES sought to enrich himself and Bank B through a

---

[11] The identity of Bank B Trader #1 is known to Your Affiant.

15

scheme to defraud and spoofing practice in connection with the purchase and sale of precious metals futures contracts on the COMEX. By placing a fully visible large-volume order for precious metals futures contracts at certain price levels with the intent, at the time the order was placed, to cancel the order before execution, BASES created the false appearance of substantial supply or demand in order to fraudulently induce other market participants to react to his deceptive manipulation of supply and demand.

29. BASES implemented, at various times, the following pattern of order and trade activity in the precious metals futures contract markets, consistent with the Deceptive Strategy described in paragraphs 23 – 24 above. There is probable cause to believe that the pattern articulated below is materially deceptive and constitutes spoofing:

a. First, BASES would place a Primary Order to buy or to sell using an iceberg functionality on one side of the market close to the prevailing price at which that given precious metals futures contract was trading;

b. Second, after placement of the Primary Order and while the Primary Order was pending, BASES would place one or more fully visible Opposite Orders of at least 10 lots, without using iceberg functionality, on the opposite side of the market from the Primary Order and close to—*i.e.*, typically within five ticks of—the prevailing price at which that given precious metals futures contract was trading;

c. Third, at least one lot of BASES's Primary Order would be filled; and

d. Fourth, after filling at least one lot of his Primary Order, BASES would quickly cancel his Opposite Orders, typically within five seconds after placing the Opposite Orders and before the Opposite Orders could be executed.

16

30. For example, BASES engaged in the following activity in the gold futures contracts market on or about November 14, 2011:

   a. On or about November 14, 2011, at approximately 14:07:40.294, BASES placed an iceberg Primary Order to buy 50 gold futures contracts (showing only one visible lot) at the price of $1,780.50, which was the prevailing best bid price at that point in time. Between 14:07:40.294 and 14:08:03.142, 19 lots of BASES's iceberg Primary Order filled.

   b. Second, between approximately 14:08:05.841 and approximately 14:08:07.064, BASES placed five separate non-iceberg Opposite Orders to sell 10 gold futures contracts, for a total of 50 lots visible to the market, at a price of $1,780.70 (which was the second best prevailing bid price), and between approximately 14:08:07.623 and approximately 14:08:08.146 BASES placed four more non-iceberg Opposite Orders to sell 10 gold futures contracts, for a total of 40 visible lots, at a price of $1,780.60 (which was the prevailing best bid price).

   c. Third, less than 110 milliseconds after BASES placed the 8th Opposite Order, at approximately 14:08:08.098, BASES received the last fill on his 50-lot Primary Order to buy.

   d. Fourth, at approximately 14:08:09.028, BASES cancelled his four non-iceberg Opposite Orders to sell at the best offer price without any part of these Opposite Orders being filled and at approximately 14:08:09.422, BASES canceled his remaining five Opposite Orders to sell at the second best offer price without any part of these Opposite Orders being filled. The Opposite Orders had been active in the market for less than four seconds before BASES cancelled them.

31. As another example, BASES engaged in the following activity in the gold futures contracts market on or about July 26, 2012:

   a. On or about July 26, 2012, at approximately 6:35.21.450, BASES placed an iceberg Primary Order to buy 200 gold

17

futures contracts (showing only one visible lot) at the price of $1,616.50, which was the prevailing best bid price at that point in time. Between approximately 6:35:21.451 and approximately 6:35:42.003, 62 lots of BASES's iceberg Primary Order filled.

b.    Second, between approximately 6:35:42.410 and approximately 6:35:43.070, BASES placed five separate non-iceberg Opposite Orders to sell 10 gold futures contracts, for a total of 50 visible lots, at a price of $1,616.80 (which was at the third best prevailing offer price at that point in time).

c.    Third, after BASES placed the five Opposite Orders, BASES's iceberg Primary Order filled 2 more lots, at approximately 6:35:43.665 and 6:35:43.677.

d.    Fourth, at 6:35:44.236, BASES cancelled his five Opposite Orders to sell without any part of these Opposite Orders being filled. The Opposite Orders had been active in the market for less than two seconds before BASES cancelled them.

32.    As another example, BASES engaged in the following coordinated spoofing activity with PACILIO in the gold futures contracts market on or about February 4, 2011:

a.    On or about February 4, 2011, at approximately 7:17:03.890, BASES placed an iceberg Primary Order to buy 50 gold futures contracts (showing only one visible lot) at the price of $1,348.60, which was the prevailing best bid price at that point in time.

b.    Second, before any of BASES's Primary Order had traded, at approximately 7:17:10.928, PACILIO placed a fully visible, non-iceberg Opposite Order to sell 500 gold futures contracts at a price of $1,348.70, which was the best prevailing offer price at that point in time. Less than a half second later, PACILIO then placed two more fully visible, non-iceberg Opposite Orders each to sell 25 gold futures contracts at a price of $1,348.70, which was the best

18

prevailing offer price at that point in time, for a total visible combined Opposite Order volume of 550 lots.

c.    Third, less than one second after PACILIO placed the Opposite Orders, BASES's iceberg Primary Order began trading, ultimately filling all 50 lots.

d.    Fourth, at approximately 7:17:11.896, PACILIO cancelled all three of his non-iceberg Opposite Orders to sell. The Opposite Orders had been active in the market for less than one second before PACILIO cancelled them.

33.    Based on the market-depth, trade, and order data obtained in the investigation and analyzed to date to identify the general pattern of trading activity summarized above in Paragraph 29, between the approximate time period of June 2010 and April 2014, BASES engaged in this pattern of trading activity hundreds of times, placing thousands of Opposite Orders, and participated in dozens of instances of coordinated spoofing with PACILIO and others that are consistent with the pattern of activity summarized above.[12]

### BASES Brags About His Spoofing Abilities

34.    On or about January 16, 2015, BASES participated in a "chat" room with another precious metals trader at Bank B ("Bank B Trader #2").[13] While in the chat room with Bank B Trader #2, BASES discussed his historical practice of spoofing:

---

[12]    These approximate summary figures are based on an analysis to date of available RAPID order message data and ARMADA market-depth data obtained from the CME Group. The data analysis is ongoing, and these approximate summary figures may change as additional data covering the relevant time period is obtained.

[13]    The identity of Bank B Trader #2 is known to Your Affiant.

Bank B Trader #2:  when you were a younger man where you also this angry?

BASES:  In a different way

BASES:  I was a tyrant

BASES:  Different world

BASES:  U called out dealers[14]

BASES:  Sppoofed the mkt

BASES:  Lined people up

***

BASES:  It was very physcial and emotional

BASES:  I was very good

BASES:  At it

PACILIO's Personal Execution of the
Scheme to Defraud and Spoofing Practice at Bank B

35.    Based on evidence uncovered by the FBI during the investigation, beginning in or around at least January 2010 and continuing until in or around at least April 2011, PACILIO sought to enrich himself and Bank B through a scheme to defraud and spoofing practice in connection with the purchase and sale of precious metals futures contracts on the COMEX.  By placing a large-

---

[14]    Based on the retrospective context and the text of this chat, specifically, BASES's reference to "call[ing] out dealers," it is not clear to Your Affiant whether BASES was referring to "[s]ppoof[ing]" in the electronic trading markets examined for purposes of the analysis summarized herein or in some other market.

20

volume order for precious metals futures contracts at certain price levels with the intent, at the time the order was placed, to cancel the order before execution, PACILIO created the false appearance of substantial supply or demand in order to fraudulently induce other market participants to react to his deceptive market information.

36.    PACILIO implemented, at various times, the following pattern of order and trade activity in the precious metals futures contract markets, consistent with the Deceptive Strategy described in paragraphs 23 – 24 above. There is probable cause to believe that the pattern articulated below is materially deceptive and constitutes spoofing:

>    a.    First, PACILIO would place a Primary Order to buy or to sell using an iceberg functionality on one side of the market close to the prevailing price at which that given precious metals futures contract was trading;
>
>    b.    Second, after placement of the Primary Order and while the Primary Order was pending, PACILIO would place one or more fully visible Opposite Orders of at least 10 lots, without using iceberg functionality, on the opposite side of the market from the Primary Order and close to—*i.e.*, typically within five ticks of—the prevailing price at which that given precious metals futures contract was trading;
>
>    c.    Third, at least one lot of PACILIO's Primary Order would be filled; and
>
>    d.    Fourth, after filling at least one lot of his Primary Order, PACILIO would quickly cancel his Opposite Orders, typically within five seconds after placing the Opposite Orders and before the Opposite Orders could be executed.

37.     Based on communications obtained by the FBI during the investigation, there is probable cause to believe that PACILIO well knew that the practice of spoofing was deceptive and manipulative.

38.     For instance, on or about November 16, 2010, based on an analysis of PACILIO's trade and order data, PACILIO placed Primary Orders and Opposite Orders in a pattern consistent with that described above in paragraph 36.  Moreover, on that same day, PACILIO narrated his trading activity as follows while in a "chat" room with seven other traders at Bank B, including BASES and Bank B Trader #1:

> a.     At approximately 8:40:52, PACILIO wrote in the chat room (emphasis added):
>
> > guys the algos are really geared up in here. **if you spoof this it really moves**. thats where alot of this noise is coming from[15]
>
> b.     Approximately 20 seconds after saying, "if you spoof this it really moves," at approximately 8:41:14.272, PACILIO placed an iceberg Primary Order to sell 10 silver futures contracts at $25.480.  PACILIO's 10-lot sell order rested in the market un-filled for approximately 29 seconds. Beginning at approximately 8:41:43.035, and continuing over the course of less than one second until approximately 8:41:44:013, PACILIO placed the follow succession of non-iceberg Opposite Orders—totaling 250 lots—to buy silver futures contracts:

---

[15]     Based on my training and experience and work on this investigation, Your Affiant has learned that many market participants use computer algorithms (or "algos") to engage in high-frequency, automated trading strategies.  Because the volume of orders in the visible order book often is a factor that can influence the trading decisions of these automated trading strategies, such algorithms are susceptible to reacting when larger orders are placed.

| Time | Amount | Price |
|---|---|---|
| 8:41:43.035 | 200 | $25.455 |
| 8:41:43.200 | 10 | $25.455 |
| 8:41:43.345 | 10 | $25.455 |
| 8:41:43.566 | 10 | $25.460 |
| 8:41:43.794 | 10 | $25.470 |
| 8:41:44.013 | 10 | $25.470 |

c.   Approximately 55 milliseconds after placing the last Opposite Order, at approximately 8:41:44.068, one lot of PACILIO's Primary Order was filled at $25.480. PACILIO then began to cancel his Opposite Orders without any of them being executed, cancelling both 10-lot orders at $25.470 at approximately 8:41:44.735 and approximately 8:41:44.736. Less than 600 milliseconds later, between approximately 8:41:45.332 and approximately 8:41:45.335, the remaining nine lots of PACILIO's 10-lot Primary Order were filled at $25.480. Approximately 140 milliseconds after the last lot of the Primary Order was filled, between approximately 8:41:45.475 and approximately 8:41:45.851, PACILIO cancelled the remaining Opposite Orders without them being executed. The duration of PACILIO's Opposite Orders ranged from approximately 723 milliseconds to 2.814 seconds, and the duration of the Primary Order from its placement to the fill of its last lot was approximately 31.063 seconds.

d.   Approximately 38 seconds later, at approximately 8:42:24, PACILIO said to the other Bank B traders in the chat room, "i put in selling at 48 in silver. i bid 45 for 200. 46 and 47 for 20 each and got filled." Based on my review of the chat, PACILIO's trading activity, and my training and experience, Your Affiant believes that in the chat room PACILIO was recounting his trading activity summarized in paragraphs 38.b and 38.c above.

39.   Further, on or about February 11, 2011, based on an analysis of PACILIO's trade and order data, there is probable cause to believe that PACILIO placed Opposite Orders in a pattern consistent with that described above in paragraph 36, to assist the execution of Bank B Trader #1's Primary

Order. Moreover, PACILIO discussed his trading activity in a chat room with Bank B Trader #1:

     a.    At approximately 8:04:10.686, Bank B Trader #1 placed an iceberg Primary Order to buy 50 silver futures contracts at $29.960. For the following approximately 30 seconds, however, the Primary Order went un-filled, until a total of 30 lots were executed between approximately 8:04:41.861 and approximately 8:04:43.151. At or about 8:04:43, in a chat room with other Bank B precious metals traders, including BASES, PACILIO said "ok. [Bank B Trader #1]. you have this silver. right?"

     b.    Approximately 40 seconds later, PACILIO placed three non-iceberg Opposite Orders to sell a total of 550 silver futures contracts. Specifically, at approximately 8:05:21.657, PACILIO placed an Opposite Order to sell 500 silver futures contracts at $29.975, and at approximately 8:05:21.749 and at approximately 8:05:21.934, he placed two Opposite Orders to sell 25 silver futures contracts each at $29.975. Less than 900 milliseconds after placing the last Opposite Order, PACILIO cancelled all three Opposite Orders simultaneously at approximately 8:05:22.788 without them being executed. Between approximately 8:05:21.690 and approximately 8:05:22.646, the remaining 20 lots of Bank B Trader #1's 50-lot Primary Order were filled while the Opposite Orders were active.

     c.    In the chat room, starting at 8:05:29, PACILIO then engaged in the following conversation with Bank B Trader #1 (emphasis added):

> 8:05:29 PACILIO: **that was me pushing it**
>
> 8:05:55 PACILIO: dont do it yourself. i will help you
>
> 8:06:01 PACILIO: dont spoof it
>
> 8:06:10 PACILIO: what did you get 70 lots there?
>
> 8:06:12 Bank B Trader #1: ok
>
> 8:06:19 Bank B Trader #1: yep

     d.     Based on my review of the chat, PACILIO's trading activity, and my training and experience, Your Affiant believes that in the chat room PACILIO was recounting his trading activity summarized in paragraph 39.b above.

40.     As another example of PACILIO's placing Primary and Opposite Orders consistent with the pattern described in paragraph 36 above, PACILIO engaged in the following activity in the gold futures contracts market on or about March 29, 2011:

     a.     On or about March 29, 2011, at approximately 10:17:50.900 PACILIO placed an iceberg Primary Order to buy 25 gold futures contracts with one lot visible at the price of $1,419.80, which was the prevailing best bid price at that point in time. After approximately 4 seconds, none of PACILIO's Primary Order had been filled.

     b.     Second, at approximately 10:17.55.123, PACILIO placed a non-iceberg Opposite Order to sell 325 gold futures contracts and between 10:17:55.309 and approximately 10:17:55.539, PACILIO placed two more non-iceberg Opposite Orders to sell 25 gold futures contracts each (for a total of 375 visible lots), all at the price of $1,420.00, which was the prevailing best offer price at that point in time.

     c.     Third, less than 20 milliseconds after PACILIO placed the 325 lot Opposite Order, six lots of PACILIO's iceberg Primary Order to buy were filled at approximately 10:17:55.142. The remainder of PACILIO's iceberg Primary Order to buy was filled in less than a second later, by approximately 10:17:55.781.

     d.     Fourth, at approximately 10:17:57.179, PACILIO cancelled all three of his non-iceberg Opposite Orders to sell without any part of these Opposite Orders being filled. The Opposite Orders had been active in the market for approximately two seconds before PACILIO cancelled them.

41.     Based on the market-depth, trade, and order data obtained in the investigation and analyzed to date to identify the general pattern of trading activity summarized above in paragraph 36, between the approximate time period of January 2010 and April 2011, PACILIO engaged in this pattern of trading activity, summarized above, hundreds of times, placing thousands of Opposite Orders, and participated in dozens of instances of coordinated spoofing with BASES and others that are consistent with the pattern of activity summarized above.

## CONCLUSION

42.     Based upon the foregoing, there is probable cause to believe that BASES participated and engaged in: (i) commodities fraud, in violation of Title 18, United States Code, Sections 1348(1) and 2; and (ii) spoofing, in violation of Title 7, United States Code, Sections 6c(a)(5)(C), 13(a)(2), and 13c(a); and that PACILIO participated and engaged in commodities fraud, in violation of Title 18, United States Code, Sections 1348(1) and 2.

A. WESLEY NEVENS
Special Agent
Federal Bureau of Investigation

Signed and sworn to before me this 25th day
of January 2018, in Chicago, Illinois.

HON. M. DAVID WEISMAN
United States Magistrate Judge