**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

------------------------------------------------------x
                              :

UNITED STATES OF AMERICA      :

                              :      No. 18 CR 48

                              :

      v.                      :

                              :

EDWARD BASES and JOHN PACILIO    :      Judge John Z. Lee

                              :

      Defendants.           :

                              :
------------------------------------------------------x

**DEFENDANT EDWARD BASES' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

FINN DIXON & HERLING LLP
Six Landmark Square
Stamford, CT 06901

SALVATORE PRESCOTT & PORTER, PLLC
1010 Davis Street
Evanston, IL 60201

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    SUMMARY OF THE INDICTMENT ..................................................... 1

III.   COUNTS ONE AND TWO FAIL TO STATE AN OFFENSE........................................ 4

      A.    Standard Under Fed. R. Crim. P. 12(b)................................................. 4

      B.    Because the Indictment Alleges No Misrepresentations, It Does Not Sufficiently Allege Wire Fraud............................................................ 5

      C.    The Indictment Does Not Sufficiently Allege Commodities Fraud, Because the Conduct it Describes Does Not Rise to the Level of Manipulative Activity. ...................................................................... 9

IV.   EVEN IF COUNTS ONE AND TWO STATE AN OFFENSE, THEY VIOLATE FAIR-NOTICE PRINCIPLES ....................................................... 16

V.    COUNT TWO VIOLATES THE APPLICABLE STATUTE OF LIMITATIONS ........ 19

CONCLUSION......................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)..................................................................11, 13, 14

*Bouie v. City of Columbia*,
378 U.S. 347 (1964).....................................................................................16

*CFTC v. Kraft Foods Group, Inc.*,
153 F. Supp. 3d 996 (N.D. Ill. 2015) ............................................................14

*CP Stone Fort Holdings, LLC v. Doe*,
No. 16 C 4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ...........................13, 15

*CP Stone Fort Holdings, LLC v. Doe*,
No. 16 C 4991, 2017 WL 1093166 (N.D. Ill. March 22, 2017) ...........................13

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).................................................................................9, 14

*GFL Advantage Fund, Ltd. v. Colkitt*,
272 F.3d 189 (3d Cir. 2001)......................................................................11, 13, 14

*Koch v. SEC*,
793 F.3d 147 (D.C. Cir. 2015) ......................................................................14

*Kolender v. Lawson*,
461 U.S. 352 (1983)......................................................................................16

*Markowski v. SEC.*,
274 F.3d 525 (D.C. Cir. 2001), *cert. denied*, 537 U.S. 819 (2002) ........................14

*Nanopierce Technologies v. Southridge Capital Management*,
2008 WL 250553 (S.D.N.Y. Jan. 29, 2008) ..................................................14

*Ploss v. Kraft Foods Group, Inc.*,
197 F. Supp. 3d 1037 (D. Ill. 2016) ..............................................................14

*Reynolds v. East Dyer Dev. Co.*,
882 F.2d 1249 (7th Cir. 1989) ........................................................................7

*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977).....................................................................................10

*SEC v. Lek*,
    276 F. Supp. 3d 49 (S.D.N.Y. 2017)................................................................13

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007)............................................................14

*Skilling v. United States*,
    561 U.S. 358 (2010)................................................................................6, 17, 18

*Sullivan & Long, Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) ...............................................7, 9, 10, 11, 14, 18

*United States v. Abu-Shawish*,
    507 F.3d 550 (7th Cir. 2007) ..........................................................................4

*United States v. Bogucki*,
    316 F. Supp. 3d 1177 (N.D. Cal. 2018) ..........................................................7

*United States v. Bruce*,
    531 F. Supp. 2d 983 (N.D. Ill. 2008) ..............................................................5

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1989 (2018)3, 5, 6, 9, 10, 13, 14, 15, 16

*United States v. Coscia*,
    No. 14-cr-551 (N.D. Ill.) ..................................................................................6

*United States v. Coscia*,
    No. 16-3017 (7th Cir. Oct. 6, 2016)..................................................................6

*United States v. Flotron*,
    2018 WL 1401986 (D. Ct. March 20, 2018)....................................................13

*United States v. Flotron*,
    No. 17-cr-220 (D. Conn.).............................................................................6, 13

*United States v. Huet*,
    665 F.3d 588 (3d Cir. 2012)..............................................................................4

*United States v. Lanier*,
    520 U.S. 259 (1997).........................................................................................17

*United States v. Powell*,
    576 F.3d 482 (7th Cir. 2009) ............................................................................5

*United States v. Radley*,
    632 F.3d 177 (5th Cir. 2011) .....................................................................12, 14

iii

*United States v. Radley*,
659 F. Supp. 2d 803 (S.D. Tex. 2009), *aff'd on other grounds*, 632 F.3d 177
(5th Cir. 2011)............................................................................7, 12, 13, 14, 15, 18

*United States v. Regan*,
937 F.2d 823 (2d Cir. 1991)..............................................................................11

*United States v. Risk*,
843 F.2d 1059 (7th Cir. 1988) ........................................................................4, 5

*United States v. Schock*,
2017 WL 4780614 (C.D. Ill. Oct. 23, 2017) ......................................................5

*United States v. Sheneman*,
682 F.3d 623 (7th Cir. 2012) .............................................................................5

*United States v. Sloan*,
492 F.3d 884 (7th Cir. 2007) .............................................................................5

*United States v. Stephens*,
421 F.3d 503 (7th Cir. 2005) .............................................................................5

*United States v. Weimert*,
819 F.3d 351 (7th Cir. 2016) .......................................................................7, 18

*United States v. Williams*,
553 U.S. 285 (2008)..........................................................................................17

*Williams v. Aztar Ind. Gaming Corp.*,
351 F.3d 294 (7th Cir. 2003) .............................................................................5

**Statutes**

7 U.S.C. § 6c(a)(5)...........................................................................................1, 2

18 U.S.C. § 1348(1) ........................................................................................6, 9

18 U.S.C. § 1348(2) ...................................................................................6, 9, 19

**Rules**

Fed. R. Crim. P. Rule 12(b) ...............................................................................4

**Other Authorities**

Michael J. McGowan, *The Rise of Computerized High Frequency Trading (2010)*......................7

NYMEX Rulebook, Chapter 5, Rule No. 522 ...................................................8

Seventh Cir. Pattern Crim. Jury Instr., § 1341 (2017 ed.) ...............................................................5

Defendant Edward Bases respectfully submits this memorandum in support of his motion to dismiss Counts One and Two of the Indictment, on the grounds that (i) they do not state an offense as a matter of law, (ii) they violate fair-notice principles, and (iii) the time period alleged in Count Two violates the applicable statute of limitations.

## I.      PRELIMINARY STATEMENT

Counts One and Two purport to charge Mr. Bases with two fraud-based offenses: (i) conspiracy to commit wire fraud and commodities fraud, and (ii) commodities fraud. But the Indictment's factual allegations supporting these charges describe only acts of "spoofing," *i.e.*, occasions that Mr. Bases purportedly placed orders with the intent to cancel them before execution. As shown below, the act of spoofing, without more, does not constitute fraud. It was a common trading practice that Congress did not prohibit until July 2011. And even when Congress did ban spoofing, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), it did not characterize spoofing as a form of fraud or manipulation. Rather, it included the prohibition in a new section of the Commodity Exchange Act ("CEA") proscribing trading practices deemed "[d]isruptive." *See* 7 U.S.C. § 6c(a)(5). Absent an allegation that the spoofing was combined with some other conduct that eliminated any meaningful risk that the orders could be executed (which is not alleged here), spoofing alone does not constitute fraud, and Counts One and Two must be dismissed.

## II.      SUMMARY OF THE INDICTMENT

Count One charges Mr. Bases with conspiracy, from 2007 to 2013, to commit (1) wire fraud affecting a financial institution, and (2) commodities fraud. Count Two charges him with engaging in commodities fraud from 2009 to 2014. These are the only counts in which he is named; Mr. Bases is not charged with violating the anti-spoofing statute.

According to the Indictment, Mr. Bases was employed at Bank A from June 2010 until November 2015 and at Bank B from July 2008 until June 2010, trading precious-metals futures contracts as a trader at both banks. ¶ 1.a.  The Indictment charges that he "placed one or more visible orders for precious metals futures contracts on one side of the market … that [he] intended to cancel before execution." ¶ 5.  The Indictment refers to these orders as "Fraudulent Orders." *Id.*  According to the Indictment, the object of this scheme was to "cause other market participants to buy and to sell futures contracts at quantities, prices, and times that they otherwise would not have, because, among other things, market participants reacted to the apparent increase in supply and demand." ¶ 6.

Importantly, although the Indictment refers to an "*apparent* increase in supply and demand," it acknowledges that the so-called "Fraudulent Orders" were real, live orders that could be accepted at any time. ¶ 12.  In other words, whatever Mr. Bases's intent was, the Indictment itself states that there was risk on every order.  Thus, the increase in supply and demand was real.

The Indictment alleges that the defendants accomplished their scheme by placing "one or more visible orders for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution (the 'Fraudulent Orders')," ¶ 4; they "placed lower visible quantity orders, often in the form of iceberg orders, on the opposite side of the market that they intended to execute (the 'Primary Orders')," ¶ 9; and they "placed the[se] Fraudulent Orders with the intent to artificially move the prevailing price in a manner that would increase the likelihood that one or more of their Primary Orders would be filled." ¶ 10.

2

According to the Indictment, by placing the Fraudulent Orders, the defendants "intended to inject false or misleading information (*orders they did not intend to execute*) into the market," ¶ 5 (emphasis added), in order to "create[] the false impression in the market of increased demand" or "supply," ¶¶ 7, 8. The Indictment further claims that the Fraudulent Orders "were material misrepresentations that falsely and fraudulently represented to market participants that [the defendants] were willing to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, [they] intended to cancel them." ¶ 11.

Finally, the sole overt act charged against Mr. Bases is that, on or about June 10, 2011—before the effective date of Dodd-Frank, which for the first time prohibited spoofing—Mr. Bases "placed approximately four Fraudulent Orders to sell approximately 40 gold futures contracts . . . and five Fraudulent Orders to sell approximately 50 gold futures contracts . . . in order to facilitate the execution of a Primary Order by [unnamed co-conspirator] CC-1." ¶ 18.

It is important to note what the Indictment fails to allege. The Indictment does not allege the use of any algorithm, like the one used in *United States v. Coscia*, 866 F.3d 782, 800 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1989 (2018), to "create a totally non-existent market" of orders that were effectively incapable of being filled, a market in which there was never any at-risk trading. Indeed, in *Coscia*, the Court essentially concluded that Coscia's orders were *not* real—they were illusions having no meaningful chance of being acted upon because of the speed at which the algorithm cancelled them. In stark contrast, the Indictment specifically states that, by placing the Fraudulent Orders, the alleged co-conspirators exposed Bank A to, among other things, "monetary trading losses associated with *the trading risk* that the Fraudulent Orders would be executed." ¶ 12(a) (emphasis added).

3

### III. COUNTS ONE AND TWO FAIL TO STATE AN OFFENSE

While the Indictment does not charge Mr. Bases with violating the new spoofing statute, its charges stand or fall on a single alleged fact: that Mr. Bases spoofed, that is, that he "intended to cancel" the so-called Fraudulent Orders at the time he placed them, before the orders could be executed. This alleged intent to cancel is the sole basis for the fraud allegations. ¶¶ 1s, 4, 5, 11, 12. No court has ever held that simple spoofing—without more—constitutes wire-fraud. And the specific allegations in this Indictment, which fail to include any misleading or deceptive conduct and focus only on the purported spoofing, do not support the commodities-fraud claims either. Because Counts One and Two fail to state a fraud offense, they should be dismissed.

### A. Standard Under Fed. R. Crim. P. 12(b)

Fed. R. Crim. P. Rule 12(b) "ensures that trials will be efficient" and affords defendants the opportunity to "raise defenses 'which [are] capable of determination without the trial of the general issue' before trial." *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (quoting Fed. R. Crim. P. 12(b)). An indictment is sufficient when it: "'(1) states all the elements of the crime charged; (2) informs the defendant of the nature of the charge, enabling the defendant to prepare a defense; and (3) enables the defendant to plead the judgment as a bar to later prosecution of the same offense.'" *United States v. Abu-Shawish*, 507 F.3d 550, 553 (7th Cir. 2007), (quoting *United States v. Allender*, 62 F.3d 909, 914 (7th Cir. 1995).

At the pretrial stage, "the indictment ordinarily should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case." *Risk*, 843 F.2d at 1061. However, the Court "need not blindly accept a recitation in general terms of the elements of the offense." *United States v. Huet,* 665 F.3d 588, 595 (3d Cir. 2012). The Court "must also look at the specific facts alleged in the indictment to see if an offense has been alleged." *Id.*

4

If the government's own "characterization of the undisputed facts [does] not constitute a violation of any statute," the indictment should be dismissed "not because the government [can] not prove its case, but because there [is] no case to prove." *Risk*, 843 F.2d at 1061 (alterations supplied). In other words, the indictment must be dismissed "'if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'" *United States v. Schock*, 2017 WL 4780614 (C.D. Ill. Oct. 23, 2017) (quoting *United States v. Carroll*, 320 F. Supp. 2d 748, 752 (S.D. Ill. 2004) (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002))). *Accord United States v. Bruce*, 531 F. Supp. 2d 983, 985-86 (N.D. Ill. 2008).

### B. Because the Indictment Alleges No Misrepresentations, It Does Not Sufficiently Allege Wire Fraud.

The Seventh Circuit has repeatedly held that wire fraud requires proof of "the making of a false statement or material misrepresentation, or the concealment of a material fact." *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003); *see United States v. Sheneman*, 682 F.3d 623, 628-629 (7th Cir. 2012) (same); *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009) (same); *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007) (same); *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005) (same). *See also* Seventh Cir. Pattern Crim. Jury Instr., § 1341, 1343, at p. 402 (2017 ed.) ("[T]he government must prove . . . beyond a reasonable doubt . . . [that] [t]he scheme to defraud involved a materially false or fraudulent pretense, representation, or promise[.]").

No court has ever held that spoofing—which, by itself, involves no representation or promise—constitutes wire fraud.[1] Tellingly, the government in *Coscia* expressly disclaimed any

---

[1] The government has, on occasion, since *Coscia*, extracted wire-fraud pleas out of defendants in connection with spoofing. But the government cannot use pleas to establish that particular conduct violates the wire

argument that spoofing violates the false-statement prong of the commodities-fraud statute—effectively a recognition, if not a concession, that spoofing does not involve making a false statement. *See* Gov't Opp. to Def. Post-Trial Mtns. at 5, *United States v. Coscia*, No. 14-cr-551 (N.D. Ill.) (No. 110) ("The government made clear, prior to trial, that it was not proceeding under subsection 2 of 18 U.S.C. § 1348, which requires a false statement."); *id.* ("[T]he government was not required to prove a false statement. . . . [Section 1348(1) of] the commodities fraud statute can be violated without a false statement."); Gov't Appellee's Br. at 41, *United States v. Coscia*, No. 16-3017 (7th Cir. Oct. 6, 2016) (No. 29) (acknowledging that spoofing can be prosecuted as commodities fraud only because 18 U.S.C. § 1348(1) "does not require a false statement").[2] And the Seventh Circuit in *Coscia* acknowledged that commodities-fraud charges rooted in spoofing activity do not require misrepresentations. 866 F.3d at 796.

In this case, the Indictment fails to allege either a misstatement of fact or an omission where there was a duty to speak. In fact, the Indictment does not allege that the Defendant made *any* statements in connection with his trading. Instead, it invents an implied misrepresentation by alleging that the Defendant's orders *themselves* constituted false statements that the Defendant was "willing to trade" with market participants. It then goes on to allege that this phantom representation was false because the Defendant "intended to cancel" his orders before they could be executed. ¶ 11. The allegation fails as a matter of law.

---

fraud statute. *Cf. Skilling v. United States*, 561 U.S. 358 (2010) (rejecting an interpretation of the wire fraud statute that the government previously had used to obtain dozens, if not hundreds, of honest services fraud pleas).

[2] The government did the same in its recent, unsuccessful commodities-fraud prosecution of a manual trader in the District of Connecticut. *See* Hearing Tr. at 79:18-21, *United States v. Flotron*, No. 17-cr-220 (D. Conn.) (No. 131) ("[W]e're going to proceed under 1348, prong (1), which requires a scheme to defraud, not the material misrepresentations, promises and omissions.").

To begin with, by placing orders in the market, Mr. Bases made no representations, implied or otherwise, about his trading strategy, and he had no affirmative duty to disclose his trading intentions to the market. *See Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864-65 (7th Cir. 1995) (rejecting claim that defendant implicitly represented that it would settle its trades in a naked short-selling scheme, saying that defendant "made no representations, true or false, actual or implicit, concerning the number of shares that it would sell short"); *United States v. Radley*, 659 F. Supp. 2d 803, 815 (S.D. Tex. 2009) (dismissing wire-fraud indictment, involving live bids that defendants allegedly did not intend to execute, concluding that the "indictment [did] not allege a single lie or misrepresentation"), *aff'd on other grounds*, 632 F.3d 177 (5th Cir. 2011).

At best, what the government is alleging here is that Mr. Bases *failed to disclose* to other traders, to whom Mr. Bases owed no fiduciary duty, that Mr. Bases hoped he would be able to manually cancel certain orders at just the right moment—after the market moved but before the orders were filled by high-frequency-trading algorithms capable of responding to offers and bids at almost the speed of light.[3]   However, a "mere failure to disclose, absent something more," does not constitute "fraud under the mail and wire fraud statutes . . . ." *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989). *See also United States v. Weimert*, 819 F.3d 351, 357 (7th Cir. 2016) (dismissing a wire-fraud charge based on defendant's failure to disclose that his bid "was a 'stalking horse' bid," because "omissions about a buyer's or seller's negotiating positions" are not actionable under the wire-fraud statute even if they "mislead the other party about the prices and terms they are willing to accept"); *United States v. Bogucki*, 316 F. Supp. 3d

---

[3] *See, e.g.*, Michael J. McGowan, *The Rise of Computerized High Frequency Trading*, 2010 Duke L. & Tech. Rev. 16, at *2 (2010) (high-frequency trading systems are able to execute trades "at close to the speed of light").

1177, 1182 (N.D. Cal. 2018) ("Of course, a defendant does not commit wire fraud simply by trading. Wire fraud requires a misrepresentation (or an omission in the presence of a duty)" and further holding that market counterparties were not deceived because trader owed no duty to them).

Moreover, the Indictment's assertion of falsity rests on a *non sequitur*. The Indictment charges that, because Mr. Bases "intended to cancel" his trades, he was not "willing to trade the Fraudulent Orders," which was contrary to his alleged imaginary representation that he was "willing to trade." The argument is specious. An "intention to cancel" is not equivalent to an "unwillingness to trade." In fact, Mr. Bases was obligated to trade by COMEX rules if his bid or offer was accepted by a counterparty; COMEX automatically executes transactions between counterparties, who are instantly bound.[4] The Indictment itself alleges that Mr. Bases' alleged spoof orders "exposed Bank A to . . . trading losses associated with the trading risk that the Fraudulent Orders would be executed . . ." ¶ 12. In other words, the Indictment concedes that Mr. Bases was exposed to actual market risk with every order he placed. And it fails to allege that Mr. Bases ever refused to trade when his order was accepted. Consequently, even if he hoped to cancel orders before they were accepted, he was still "willing to trade," and there is no allegation that he did not trade any order that was accepted.

Notably, despite the Indictment's intense focus on his "intent to cancel," it does not allege that Mr. Bases implicitly represented that he would not cancel his orders. Nor could it advance such a claim, because the vast majority of orders are cancelled as a matter of routine. *See* Mary L. Shapiro, Chairman, Sec. & Exch. Comm'n., Speech by SEC Chairman:

---

[4] *See* NYMEX Rulebook, Chapter 5, Rule No. 522 ("In electronic trading, while outstanding, all or any part of any bid or offer is subject to immediate acceptance by any trader. Members are required to honor all bids or offers which have not been withdrawn from the market.").

Strengthening our Equity Market Structure (September 7, 2010) *available at* http://www.sec.gov/news/speech/2010/spch090710mls.htm.  Thus, the market was fully aware that any order could be cancelled at any time before it was accepted. *See Sullivan & Long, Inc.*, 47 F.3d at 863 ("Being on notice [that short sellers are not required to borrow stock], [counterparties] were not deceived.").  In sum, because the Indictment fails to allege any misrepresentation or material omission, it does not sufficiently allege wire fraud, and the wire-fraud prong of the conspiracy charge should be dismissed.

### C. The Indictment Does Not Sufficiently Allege Commodities Fraud, Because the Conduct it Describes Does Not Rise to the Level of Manipulative Activity.

Because the Indictment does not allege a misrepresentation, it also does not allege commodities fraud under 18 U.S.C. § 1348(2), which is patterned on the wire-fraud statute. Although the Seventh Circuit held in *Coscia* that Section 1348(1) does not require proof of a false statement, 866 F.3d at 796, it still requires allegations constituting a scheme to defraud. While the Indictment attempts to plead a scheme to defraud involving manipulation — asserting that defendant "intended to inject false or misleading information (*orders they did not intend to execute*) into the market," ¶ 5 (emphasis added), in order to "create[] the false impression in the market of increased demand" or "supply" — such conduct, as a matter of law, does not constitute manipulative activity.  Instead, the Indictment alleges only live, open-market activity, with nothing more to support a claim of fraudulent conduct.

A charge of fraud-based manipulation requires proof of "intentional or willful misconduct designed to deceive or defraud investors by *controlling or artificially affecting* the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (emphasis added). Although the Indictment parrots these words, ¶¶ 6-10, it fails to allege any of the types of manipulative devices that courts have found to be fraudulent.  For example, it does not allege

that Mr. Bases *controlled* the precious-metals markets. Nor does it allege that his open market orders *artificially* affected the price of commodities.

The Supreme Court has long held, in the context of securities-fraud claims, that "manipulation" is "virtually a term of art" and refers "generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476 (1977), (citing *Ernst & Ernst*, 425 U.S. at 195, 199 n.21, 205). As the Seventh Circuit put it, "the essence of the offense [of market manipulation under the securities laws] is creating 'a false impression of supply or demand,' for example through wash sales, where parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock." *Sullivan & Long, Inc.*, 47 F.3d at 864.

In other words, the crux of fraudulent manipulation is *artificial* market activity—where no real trading is occurring. Real trades involve actual market risk, while fake trades do not, as was the case in *Coscia*. No such misconduct is alleged in the Indictment. As the Indictment expressly acknowledges, every order Mr. Bases placed was live and subject to immediate execution. ¶ 12.

The clear weight of authority among the circuit courts is that open-market activity, without more, does not constitute fraud. In *Sullivan & Long, Inc.*, the Seventh Circuit upheld the dismissal of a market-manipulation complaint predicated on the defendant's massive naked short-selling scheme, whose object was to depress the stock price of a bankrupt entity. The Court dismissed plaintiff's argument that, because the defendant had no intention of delivering the shares he sold short, his scheme was akin to unlawful wash sales, saying "there was nothing like that here. On the other side of all of [defendant's] transactions were real buyers, betting

10

against [defendant], however foolishly, that the price of LTV stock would rise." The Court likened defendant to a "bluffer in a poker game." 47 F.3d at 861 ("This is just to say that [defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart. But so what?").

In *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87 (2d Cir. 2007), the Second Circuit similarly rejected fraud-based manipulation claims predicated on a short-selling scheme designed to drive down the price of the subject shares, holding that, to sustain a manipulation claim based on open-market transactions, "something more" than just the open-market activity must be alleged. Accepting as true the complaint's allegations, the Second Circuit concluded that short selling, even in great quantities, is not inherently manipulative. The evil that the anti-fraud provisions seek to prevent is rigged prices, not at-risk market trades. *Id.* at 101. There "must be some market activity, such as 'wash sales, matched orders, or rigged prices'" for there to be manipulation. *Id.* (citing *Santa Fe Industries, Inc.*, 430 U.S. at 476). The Court concluded: "[t]o be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." *ATSI Commc'ns* 493 F.3d at 101;[5] *see also GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001) (rejecting claim that short-selling scheme designed to depress the price of a security constituted a fraudulent manipulative device because short sales were real trades and did not create a *false* impression of market activity).

---

[5] In a previous decision, *United States v. Regan*, 937 F.2d 823 (2d Cir. 1991), the Second Circuit held, without much discussion, that a short-selling scheme to depress prices constituted fraud. In that case, however, just before finalizing its agreement with the issuer to underwrite a convertible bond offering, the banker directed its trader to secretly short sell the issuer's stock to bring down the price in order to adversely affect the offering. The Court found this secretive behavior to be fraudulent in the context of this incipient fiduciary relationship between the issuer and the banker. *Id.* at 829-830.

11

In *United States v. Radley*, 632 F.3d 177 (5th Cir. 2011), the Fifth Circuit specifically rejected the proposition that a live bid can constitute a false market signal simply because the trader does not intend to transact. In *Radley,* the indictment charged commodities manipulation under the CEA and wire fraud, alleging that the defendants had attempted to drive up the price of TET propane by placing multiple bids, known as "stacked bids," on an electronic interface called Chalkboard "in order to trick other market participants into believing that demand for the commodity was strong and came from more than one source." *Id.* at 180. The indictment further alleged that the defendants never intended to "enter into a transaction based on each bid." *Id.* at 183. Even though the traders did not intend to transact, the Court noted that they *did* transact if their bids were hit. *Id.* at 183-184.

The principal issue in *Radley* was whether defendants' bids on TET propane were "transactions" within the meaning of the CEA and thereby exempt from the CEA's anti-manipulation provisions under an exemption for "transactions" in non-agricultural commodities. While the Fifth Circuit held that bids were "transactions" and thus exempt, the Government argued that even if the bids were exempt, they were nonetheless actionable as fabrications under a false-reporting precedent known as *Futch*, because the bids conveyed false information about the number of actual buyers in the market. The Court agreed that false representations might be actionable despite the exemption, but it forcefully disagreed that live, at-risk bids convey any *false* information to the market. As the Court put it, the government's arguments "overlook the bids' legitimacy," holding that, "[u]nlike the false reports in *Futch*, the bids in this case were real; a counter-party could have accepted them and formed an enforceable contract at any time." In affirming the indictment's dismissal, the Court concluded that "[u]nless [the bids] were somehow illusory, which was not the case," they were "transactions" and thus exempt. *Id.* at

12

183-84.  The Seventh Circuit in *Coscia* specifically acknowledged that the bids at issue in *Radley* were distinguishable precisely because Coscia's bids were virtually incapable of execution due to the pure speed at which the specially designed algorithm cancelled orders. *Coscia*, 866 F.3d at 797 n.64.

Although the Fifth Circuit's *Radley* decision focused on a specific CEA exemption not relevant here, the Court's rejection of the notion that a live bid can be misleading is exactly on point. *See Radley*, 659 F. Supp. 2d at 815 ("While these facts do successfully allege an increase in price, they fall short of alleging an **artificial** price because none of these bidding tactics is anything other than legitimate forces of supply and demand.") (bold in original).[6]  *See also GFL Advantage Fund, Ltd.*, 272 F.3d at 208, 214 (a trader does not "inject[] . . . inaccurate information into the market or creat[e] . . . a false impression of supply and demand for a stock" by engaging in "legitimate transactions with real buyers on the other side of the sale."); *CP Stone Fort Holdings, LLC v. Doe*, No. 16 C 4991, 2016 WL 5934096 at 6 (N.D. Ill. Oct. 11, 2016) (dismissing a civil spoofing complaint because allegedly fraudulent orders "were legitimate and could have been matched at any time by a willing participant placing an aggressive order").[7]

---

[6] In *United States v. Flotron*, 2018 WL 1401986 (D. Ct. March 20, 2018), the district court denied defendant's motion to dismiss an indictment charging a conspiracy to commit commodities fraud based on spoofing behavior.  The court rejected the *Radley* court's conclusion that live bids cannot create an *artificial* price or other false impression of market activity, holding that the trader's intent was all that mattered.  However, this ruling stands in contrast to the *Coscia* decision, which did *not* reject *Radley's* conclusion, but rather distinguished it on the ground, among others, that Radley's bids were at risk of being matched, while Coscia's bids were not.  Moreover, the *Flotron* decision provides little analysis to support its conclusion, and it does not address the Second Circuit's *ATSI* decision, which squarely holds that open-market activity, standing alone, cannot constitute fraud, even accepting the complaint's allegation that the defendant intended to drive down ATSI's price by aggressively short selling it.

[7] In a subsequent decision, the Court dismissed an amended complaint that added an allegation that "identified actions taken by defendants to ensure (as much as possible) that the Deceptive Orders would not be executed." *CP Stone Fort Holdings, LLC v. Doe*, No. 16 C 4991, 2017 WL 1093166 *3 (N.D. Ill. March 22, 2017). Although the Court found this allegation to be satisfactory, it dismissed the amended complaint for failure to allege loss causation. *But see SEC v. Lek*, 276 F. Supp. 3d 49, 64 (S.D.N.Y. 2017)

As in *Sullivan & Long, Inc., ATSI, GFL* and *Radley*, the alleged conduct at issue in this Indictment consists purely of at-risk open-market bids and offers without anything more that might inject false information into the market.[8] The significant factor in these cases was that the defendants' trades or orders were live, putting each defendant at market risk—the hallmark of a trading strategy—unlike classic manipulative devices involving no risk to a defendant. As these cases make plain, lawful orders or transactions by themselves do not send any false signal or convey any false facts. The only "inaccurate information" alleged in the Indictment is the alleged misrepresentation, somehow embedded in Mr. Bases's orders, regarding his "willingness to trade"—the same alleged false signal that the Court in *Radley* rejected out of hand. *See* 632 F.3d at 183-84.

The Seventh Circuit's decision in *Coscia* establishes the "something more" that is required to allege commodities fraud in a case involving only open-market activity. *Coscia* involved two indicia of fraudulent market manipulation: (1) a risk-free trading scheme that created artificial prices, and (2) elements of market domination. *See Ernst & Ernst*, 425 U.S. at

---

(rejecting argument that open-market activity may never be manipulative, holding that "this argument largely misses the mark. It ignores the thrust of the SEC's claim, which concerns coordinated patterns of trading, indeed voluminous trading, designed to mislead the market.").

[8] Some cases suggest that the "something more" element can be satisfied by proof of intent to manipulate or by an absence of legitimate economic rationale for the trading. However, upon closer examination, each such case involved a more traditional form of manipulation, such as market domination or marking the close. *See, e.g., Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015) (marking the close); *Markowski v. SEC.*, 274 F.3d 525 (D.C. Cir. 2001) (questioning whether open-market manipulation can constitute fraud even where defendant dominated the market, but deferring to SEC's interpretation that lawful trades are fraudulent if trader intended to manipulate), *cert. denied*, 537 U.S. 819 (2002); *SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) (where there is intent to manipulate, open-market transactions can constitute fraud, at least in case alleging marking the close); *CFTC v. Kraft Foods Group, Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) (scheme to affect prices in which defendant acquired 87% of open market interest was fraudulent); *Ploss v. Kraft Foods Group, Inc.*, 197 F. Supp. 3d 1037 (D. Ill. 2016) (where defendant acquired 87% of open market interest "something more" was found where there was no legitimate economic rationale for the trades). *But see Nanopierce Technologies v. Southridge Capital Management*, 2008 WL 250553 (S.D.N.Y. Jan. 29, 2008) (subjective intent to manipulate not enough to constitute fraud).

199 (manipulation requires "intentional or willful conduct designed to deceive or defraud investors by *controlling or artificially affecting* the price of securities.") (emphasis added).

The defendant in *Coscia* was a proprietary trader who made his living by illegally spoofing the markets, and his scheme's scale was enormous. In upholding his commodities-fraud conviction, the Court found most significant that the scheme was virtually riskless to the defendant, who had designed an elaborate computer algorithm, capable of placing and cancelling orders within milliseconds, that used thousands of "large orders to inflate or deflate prices, *while also structuring that system to avoid filling of large orders*." *Coscia*, 866 F.3d at 797 (emphasis in original). The fill rate on Coscia's nearly 25,000 spoof orders was just .08% in the principal trading market, a point the Court gave great emphasis. The Court also observed that the defendant's algorithm essentially dominated the market; in the Court's words, it "create[d] a totally non-existent market." *Id*. at 800. In terms directly applicable here, the Court specifically distinguished the district courts' decisions in *Radley* (659 F. Supp. 2d 803) and *CP Stone Fort Holdings, LLC* (2016 WL 5934096), which dismissed open-market fraud claims, stating:

> Neither of these cases involved, as did this case, the development of a specific program to create the illusion of artificial market movement that included the use of large orders to inflate the price while also taking steps to avoid transactions in the large orders. Indeed, in *Radley*, the court specifically noted that the alleged facts fell "short of alleging an **artificial** price because none of these bidding tactics is anything other than legitimate forces of supply and demand." Radley, 659 F. Supp. 2d at 815 (emphasis in original). . . . Here, however, Mr. Coscia artificially moved the market by cancelling all but 0.08% of his large Chicago Mercantile Exchange orders. R.86 at 127 (Tr. 394).

*Coscia*, 866 F.3d at 797 n.64 (bold in original).

This case is far more like *Radley* and *CP Stone Fort* than it is like *Coscia*. The Indictment charges only manual bids and offers with no algorithm, or other conduct, to eliminate the risk that the alleged spoof orders could be transacted. Indeed, the Indictment specifically alleges that the defendants' so-called Fraudulent Orders exposed Bank A to real market risk.

15

¶ 12.  Nor does the Indictment allege that the Defendant created "a totally non-existent market" or otherwise controlled the market.  In short, the Indictment does not allege commodities fraud.

## IV.  EVEN IF COUNTS ONE AND TWO STATE AN OFFENSE, THEY VIOLATE FAIR-NOTICE PRINCIPLES

If there is any doubt about whether the alleged conduct constitutes wire fraud or commodities fraud, those doubts must be resolved in the Defendant's favor, and Counts One and Two must be dismissed.  Prior to Dodd-Frank, there were no criminal prosecutions of spoofing – under the wire fraud, commodities fraud or any other statute.  The indictment in *Coscia* (charging commodities fraud) was not filed until October 2014,[9] well after Dodd-Frank's effective date on July 16, 2011.  As the Seventh Circuit observed in *Coscia*, it was the new spoofing statute that "put the trading community on notice" that spoofing was now against the law. *Coscia* 866 F.3d at 793.  Moreover, even Dodd-Frank characterized the conduct as "disruptive," not fraudulent.  The government's attempt to stretch the bounds of the wire and commodities fraud statutes to ensnare simple spoofing, most of which allegedly occurred prior to Dodd-Frank's effective date, is squarely at odds with basic fair-notice principles. *See Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) ("an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, s 10, of the Constitution forbids").

To satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  The Supreme Court has "described vague statutes as failing 'to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so

---

[9] The *Coscia* indictment did not include any charge of wire fraud.

standardless that [they] authoriz[e] or encourag[e] seriously discriminatory enforcement.'" *United States v. Williams,* 553 U.S. 285, 304 (2008). "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). The "touchstone" of constitutional fair notice "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

In *Skilling*, 561 U.S. at 402-03, the Supreme Court considered whether the term "honest services fraud" under the wire-fraud statute was so vague as to be unconstitutional. The Court agreed with the defendant that the term was vague, but it then attempted to determine whether a more-cabined construction was possible to save the statute from invalidation. In making this judgment, the Court first considered whether lower-court precedent had clearly and uniformly established that certain types of conduct constituted the crime. It concluded that only bribery and kickbacks met this test. The Court observed, "[a]lthough the Courts of Appeals upheld honest-services convictions for 'some schemes of non-disclosure and concealment of material information,' they reached no consensus on which schemes qualified." *Id.* at 410 (citation omitted). The Court decided that, to "save [the] statute from unconstitutionality," *id.* at 406, this "amorphous category of cases" must be excluded, and the statute's reach must be confined to the consensus understanding of honest services fraud. *Id.* at 410. The Court also invoked the rule of lenity, noting that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Id.* at 410-11, (citing *Cleveland v. United States*, 531 U.S. 12, 25 (2000), (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971))).

As applied in this case, the wire and commodities fraud statutes are unconstitutionally

17

vague because the statutes and case law did not give fair notice that the trading practice at issue was a crime. *See Radley*, 659 F. Supp. 2d 803 (upholding vagueness challenge and dismissing indictment in criminal CEA manipulation prosecution because the meaning of "artificial price" is vague in the context of open market bids and offers). *See also Weimert*, 819 F.3d at 354 (invoking rule of lenity to reverse employee's wire fraud conviction for lying to employer about a negotiating position, because law governing employee's disclosure obligations was unclear, and emphasizing how common it is "for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction").

While all courts agree that illegal, riskless wash sales, matched orders, and rigged trades constitute fraud, only a handful of mainly district court decisions in civil cases has held that lawful *open-market* trading can, in limited circumstances, constitute fraud if the trader intended to manipulate the market. However, this is a decidedly minority view. The vast majority of circuit courts to consider the issue has held that pure at-risk open market activity cannot be fraud, regardless of the trader's intent.

The Indictment in this case does not allege anything akin to wash sales, matched orders, or rigged trades. It thus does not satisfy the *Skilling* test. During the relevant period (and to this day) there was no consensus in the courts that what is alleged here was a crime; on the contrary, the near-consensus view was and is that it was not even a violation of civil law. *See Sullivan & Long, Inc.*, 47 F.3d at 864 (defendant owed no duty to the market to disclose his trading intentions); *id*. at 861 ("This is just to say that [defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart. But so what?").

Taken in the light most favorable to the government, the law at the relevant time was at

18

best unclear; thus the rule of lenity mandates that Counts One and Two be dismissed.

## V.     COUNT TWO VIOLATES THE APPLICABLE STATUTE OF LIMITATIONS

Count Two should be dismissed because the time period alleged exceeds the six-year statute of limitations applicable to commodities fraud under 18 U.S.C. § 1348. Mr. Bases adopts, and joins in, the arguments and authorities in the Memorandum of Law in Support of John Pacilio's Motion to Dismiss.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Mr. Bases respectfully requests that the Court enter an order dismissing Counts One and Two of the Indictment.

Dated:  November 16, 2018          Respectfully submitted,

FINN DIXON & HERLING LLP

By: /s/ Alfred U. Pavlis
Alfred U. Pavlis
Andrew M. Calamari
Six Landmark Square
Stamford, CT 06901-2704
(203) 325-5000
apavlis@fdh.com


SALVATORE PRESCOTT & PORTER PLLC


By: /s/ Julie B. Porter
Julie B. Porter
1010 Davis Street
Evanston, IL 60201
(312) 283-5711
porter@spplawyers.com

*Counsel for Defendant Edward Bases*

20

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 16, 2018, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will provide notice of the filing to all

counsel of record.

By: <u>/s/ Julie B. Porter</u>
Julie B. Porter