**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **18 CR 48** |
| | ) | |
| **v.** | ) | **Judge John Z. Lee** |
| | ) | |
| **EDWARD BASES and JOHN PACILIO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Edward Bases and John Pacilio have been indicted on charges arising from trading practices in the commodity futures markets that the government contends amounted to "spoofing"—that is, placing bids or offers with the intent not to execute them. They did so, the indictment alleges, in order to artificially inflate or deflate market prices and obtain more favorable market positions for their intended transactions. The indictment charges Bases and Pacilio with committing wire fraud affecting a financial institution under 18 U.S.C. § 1343, commodities fraud under 18 U.S.C. § 1348, as well as conspiracy to commit commodities fraud under 18 U.S.C. § 1349. In addition, the indictment charges Pacilio separately with violating the anti-spoofing provision of the Commodity Exchange Act, 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2).

Bases and Pacilio have moved to dismiss the indictment on various grounds. Their principal argument is that bids and offers placed in an open market cannot constitute, as a matter of law, grounds for a charge of wire fraud or commodities

fraud. This is so, they contend, because the bids and offers accurately state their terms and can be accepted (and enforced) by anyone in the market that wishes to fill them. But this theory ignores the indictment's allegations (which must be taken as true at this stage) that Defendants never intended to fill the bids and orders in question and placed them solely for the purpose of creating a misleading picture of market conditions that they used to their benefit. For the reasons more fully explained below, Defendants' motions are denied.

## I.     Factual Background[1]

Bases and Pacilio have been employed as precious metals futures traders since 2008 and 2007, respectively. Indictment, Count 1 ¶¶ 1(a)–(b), ECF No. 67. They worked at the same bank from June 2010 to June 2011, although they are alleged to have engaged in unlawful conduct before, during, and after that period. *Id.* ¶¶ 1(a)–(b), 2. According to the indictment, between at least June 2009 through October 2014, Defendants engaged in a fraudulent scheme to artificially move the prices in various precious metals futures markets in a way that facilitated the execution of certain transactions that they wanted to execute. *Id.* ¶¶ 3–18, 24.

To accomplish this, Defendants placed large orders on one side of a market with the coinciding intent to cancel them prior to their execution for the purpose of driving the price of the commodity futures contracts up or down. (Although the indictment refers to these large orders as "Fraudulent Orders," we will refer to them

---

[1]     The following allegations are taken from the indictment and must be accepted as true in evaluating Defendants' motions to dismiss. *See United States v. Clark,* 728 F.3d 622, 623 (7th Cir. 2013).

as the "Subject Orders.") *Id.* ¶¶ 3–8. At the same time, Bases and Pacilio placed smaller orders that they actually wanted to execute on the other side of the market. (The Court will refer to these smaller orders as the "Purposive Orders.") *Id.* ¶¶ 9–12.

For example, as described in the indictment, by placing numerous Subject Orders to purchase certain futures contracts (orders to purchase future contracts are called "bids"), Defendants led market participants to believe that there was a greater demand for the contracts than actually was the case; this practice drove the market price of the contracts up. At the same time that they submitted the Subject Orders, Defendants placed Purposive Orders to sell the same futures contracts (orders to sell future contracts are called "offers") at a price just above the then-prevailing market price. By artificially causing the market price to go up using this practice, Defendants increased the likelihood that their Purposive Orders would be filled at a higher price than they would have been able to obtain otherwise. *Id.* ¶ 10.

The method also worked in the other direction. Defendants placed Subject Orders to sell certain futures contracts (thereby creating an impression of increased supply in the contracts), while simultaneously placing Purposive Orders to buy the same contracts at a price lower than the then-prevailing market price. As other market participants reacted to the Subject Orders, the price of the contracts went down, and Defendants were able to fill their Purposive Orders at the lower price.

In short, the indictment alleges, Defendants' scheme of placing the Subject Orders with the intent not to execute them induced other market participants to buy or sell precious metals futures contracts at times, prices, and quantities that they

3

otherwise would not have but for Defendants' actions, in a way that benefited Defendants financially. *Id.* ¶¶ 3, 6, 12. The indictment also claims that, in February 2011, Pacilio engaged in electronic communications with various traders, including Bases and another co-conspirator, acknowledging his efforts to "push" the market by using this trading strategy. *Id.* ¶¶ 17, 24.

## II.    Legal Standard

Under Federal Rule of Criminal Procedure 7(c)(1), "[t]he indictment or information must be a plain, concise, and definite statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.* An indictment satisfies Rule 7(c)(1) if it "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

If an indictment "tracks the words of a statute to state the elements of the crime," it generally suffices, and "while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *Id.* (internal quotation marks omitted). In this way, the pleading requirements in criminal cases are less stringent than those in civil cases. *See United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013) (declining to

4

apply *Bell Atl. Corp v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to criminal cases).

That said, just as in the civil context, for the purpose of a motion to dismiss, the allegations in the indictment are accepted as true and viewed in the light most favorable to the government. *Clark*, 728 F.3d at 623; *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). And "indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) (internal quotation marks omitted).

### III. Analysis

Bases and Pacilio seek to dismiss the counts in the indictment on numerous grounds. They attack the sufficiency of the indictment, seek dismissal of a portion of the commodities fraud charges based upon the statute of limitations, and raise constitutional challenges to the fraud and spoofing counts.

### A. Sufficiency of the Indictment

Defendants first attack the sufficiency of the indictment with regard to the wire and commodities fraud counts. Each count is addressed in turn.

#### 1. Wire Fraud

The federal wire fraud statute proscribes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" via the use of wire, radio, or television communication. 18 U.S.C. § 1343. To convict a person under this section, the government must prove that the defendant: "(1) was involved in a scheme to defraud; (2) had an intent to

defraud; and (3) used the wires in furtherance of that scheme." *United States v. Faruki,* 803 F.3d 847, 852 (7th Cir. 2015) (citing *United States v. Durham,* 766 F.3d 672, 678 (7th Cir. 2014)).  Establishing a scheme to defraud "requires the making of a false statement or material misrepresentation, or the concealment of [a] material fact." *Id.* (citing *United States v. Powell,* 576 F.3d 482, 490 (7th Cir. 2009)).

As an initial matter, Defendants contend that the indictment fails to adequately plead wire fraud because the government has failed to allege an affirmative misrepresentation of any kind.  In Defendants' view, open-market orders, such as the Subject Orders, convey no information other than the price and quantity specified in the orders themselves.  And, because the orders accurately depict the terms upon which they can be accepted by counterparties in the market, Defendants assert, such open-market orders cannot form the basis of a misrepresentation claim. Indeed, Defendants add, once a counterparty accepts a bid or offer placed on the electronic exchange (which in this instance was COMEX), the originating party has no choice but to honor the acceptance in accordance with COMEX rules.

As a corollary, Defendants posit that, at best, the indictment's allegations amount only to a fraud by omission—that is, a failure by Defendants to disclose their intent to cancel the Subject Orders at the time that they were placed.  However, Defendants note, because they had no legal duty to disclose this information to others in the market, the omission cannot constitute wire fraud as a matter of law.

For the first proposition, Defendants rely upon *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995); *United States v. Radley*, 649 F. Supp. 2d

6

803 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001), and *CP Stone Fort Holdings, LLC*, No. 16-C-4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016).   But the problem with this argument is that it misapprehends the contours of the alleged fraudulent scheme, beginning with its intended targets.

Defendants' theory focuses exclusively on the potential counterparties to the Subject Orders.  As far as those counterparties are concerned, to the extent that they accepted the Subject Orders (if anyone did), the bids and offers did state accurately the price and quantity at which the orders were to be filled.  But, in the fraudulent scheme described in the indictment, the primary victims of the fraudulent scheme were not the counterparties to Defendants' Subject Orders, but the counterparties to the *Purposive Orders*, who—along with the rest of market—reasonably believed that the large Subject Orders were posted to the exchange either (1) with the intent to fill them or (2) with the intent to fill them, except when certain conditions are triggered between the time the orders are placed and they are executed (the latter scenario will be discussed more below).

Before addressing the cases cited by Defendants, we must first discuss *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017).  There, Coscia, a commodities futures trader, used a computer program to place simultaneously large orders (which he had no intention of executing) and small orders (which he hoped to fill) on opposite sides of certain commodity futures markets. The large orders artificially distorted market

prices, enabling him to fill his small orders and carry out his plan to buy low and sell high. 866 F.3d at 787–88. A jury found him guilty of committing commodities fraud, 18 U.S.C. § 1348(1), and violating the anti-spoofing statute, 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2).

Appealing his conviction, Coscia argued, among other things, that his actions could not be deemed fraudulent as a matter of law, because the large orders were fully executable on the market and subject to legitimate market risk. *Id.* at 797. The Seventh Circuit disagreed stating, "We cannot accept this argument. At bottom, Mr. Coscia confuses *illusory* orders with an *illusion* of market movement." *Id.* (internal quotations omitted; emphasis in original). "Mr. Coscia designed a scheme to pump and deflate the market through the placement of large orders," the court continued. "His scheme was deceitful because, at the time he placed the large orders, he intended to cancel the orders." *Id.*

*Coscia* appears to squarely dispose of Defendants' argument. It is true that *Coscia* involved commodities fraud, 18 U.S.C. § 1348(1), and not wire fraud, 18 U.S.C. § 1343, but the Seventh Circuit in *Coscia* recognized that the phrase "scheme to defraud" had the same meaning under both statutes. *See United States v. Vorley*, 420 F. Supp. 3d 784, 794–95 (N.D. Ill. 2019) (observing that the *Coscia* court borrowed the definition of a 'scheme to defraud' from the mail and wire fraud model jury instructions). As such, "[i]f spoofing can be a scheme to defraud under 1348(1)—and

it can, the Seventh Circuit has held—it can be a scheme to defraud under the wire fraud statute as well." *Id.*[2]

Defendants, however, attempt to distinguish *Coscia* in two ways. First, Defendants argue that *Coscia* is inapposite, because it addressed a conviction under § 1348(1), and not § 1348(2).[3] Presumably, Defendants mean to argue that, had the conviction in *Coscia* been under § 1348(2), the Seventh Circuit would have reached a different result. *See* Def. Pacilio's Mem. at 6 n.6, ECF No. 118 (arguing that *Coscia* "does not change the long-standing requirement that, for a conviction to stand under the wire fraud statute, a scheme requires the making of a false statement of material representation, or the concealment of a material fact"). This argument appears to be based upon Defendants' belief that a violation of § 1343 (wire fraud)—like § 1383(2), and unlike § 1383(1)—requires the use of "false or fraudulent pretenses, representations, or promises," and (at least in Defendants' eyes) none are alleged here. But this proposition is untenable for several reasons.

First, Defendants' argument assumes that § 1343 contains two independent subparts—one that proscribes "any scheme or artifice to defraud," and another that

---

[2]     The same definition of the phrase "scheme to defraud" has been commonly applied across various federal fraud statutes. *See, e.g., United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) (holding that "'scheme to defraud' means the same thing under 18 U.S.C. §§ 1341, 1343, and 1344"); *United States v. Bertram*, 900 F.3d 743, 748–49 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 852 (2019) (holding that "scheme to defraud" in 18 U.S.C. § 1347 means the same as the phrase under the wire fraud statute).

[3]     Section 1348(1) prohibits a "scheme or artifice . . . to defraud any person in connection with any commodity for future delivery," while § 1348(2) proscribes a "scheme . . . to obtain [money or property] by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1348(1), (2).

prohibits "any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C § 1343;[4] *see* Def. Pacilio's Mem. at 6 (noting that § 1343 prohibits "a scheme or artifice (a) to defraud or (b) to obtain money or property by means of false or fraudulent pretenses, representations, or promises"). But this is not the case.

As the district court laid out in *Vorley*, the phrase "or for obtaining money or property by means of false of fraudulent pretenses, representations, or promises" was added to the mail fraud statute (upon which the wire fraud statute is based) in 1909. 420 F. Supp. 3d at 794.[5] But even after its addition, the Supreme Court understood the mail fraud statute to define a single offense: engaging in a scheme to defraud by using the mails. *Loughrin v. United States*, 573 U.S. 351, 359 (2014). And such a scheme did not require the making of a false statement. *Vorley*, 420 F. Supp. 3d at 795.

---

[4]      Section 1343 states, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

[5]      The mail fraud statute begins with language identical to that used in the wire fraud statute: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ." 18 U.S.C. § 1341.

In fact, rather than limiting the reach of the mail fraud statute, the 1909 addition merely "clarified" that the pre-existing "scheme to defraud" language "*included* certain conduct, rather than doing independent work." *Id.* (emphasis added). Therefore, Defendants' parsing of § 1343 is incorrect, and the Seventh Circuit's discussion in *Coscia* construing the phrase "scheme to defraud" as it appears in § 1383(1) is equally applicable to § 1343 and consistent with the way it has interpreted that language in other contexts. *See Powell*, 576 F.3d at 491 (finding that, even though a transaction on its face contained no misrepresentations and both parties received what they bargained for, the failure to disclose "the whole story" regarding defendants' plan to profit from that transaction at the other party's expense constituted concealment sufficient to establish mail fraud); *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007) (explaining that a scheme to defraud exists when a defendant "demonstrated a departure from the fundamental honesty, moral uprightness and candid dealings in the general life of the community"); *United States v. Richman*, 944 F.2d 323, 332 n.10 (7th Cir. 1991) (rejecting notion that mail fraud requires the making of a false statement as "an obvious misstatement of the law" "because the mail fraud statute proscribes fraudulent schemes rather than specific misrepresentations to the party to be defrauded").

What is more, even under Defendants' construction, a scheme to defraud can be established not only by false representations, but also through "false or fraudulent pretenses." 18 U.S.C. § 1343. Thus, even if Defendants were correct that the Subject Orders did not constitute actionable misrepresentations, the indictment sufficiently

pleads that Defendants induced market participants into transactions that they otherwise would not have executed, under the false pretense that supply and demand were at a certain level when, in fact, they were not. Indictment, Count I ¶ 3; *see United States v. Leahy,* 464 F.3d 773, 789 (7th Cir. 2006) (finding a false pretense sufficient to plead wire fraud when defendant was awarded contracts based on a pretense involving falsely-awarded certifications).

Next, Defendants attempt to distinguish *Coscia* by pointing out that the present indictment does not accuse them of employing a computer program like that used by Coscia. This is important, Defendants posit, because Coscia's computer algorithm eliminated the risk that his large orders would be filled, whereas Defendants' manual trading practices did not.

But the Seventh Circuit in *Coscia* did not require the use of a computer algorithm for a conviction under the commodities fraud statute. Rather, in *Coscia*, the government pointed to the computer program and the fact that it was designed to minimize the execution of the large orders to prove that Coscia had intended to cancel the large orders *when he first placed them—i.e.*, as proof of Coscia's intent to mislead other participants in the market in order to increase the probability of filling his small orders.[6]

---

[6] Coscia's computer program was designed to cancel the large orders under three conditions: (1) after a certain amount of time (usually milliseconds after the orders were placed), (2) when a portion of a large order was filled, or (3) when all of Coscia's small orders were filled. *Coscia*, 866 F.3d at 789. As a result, for example, only 0.08% of his large orders on the Chicago Mercantile Exchange were filled, while 35.61% of his small orders were filled. *Id.* at 796. And, on the International Exchange, only 0.5% of Coscia's large orders were filled. *Id.* The government also offered testimony that Coscia's order-to-fill ratio (that is, the average size of the order he posted divided by the average size of the orders filled) was

12

As for Defendants' contention that, because they traded manually, there was a risk that their Subject Orders would be filled, while Coscia bore no such risk, this is not entirely true. In fact, a portion (albeit small) of Coscia's large orders were filled by other market participants. Certainly, Defendants may be correct that the probability of filling their Subject Orders was greater than the probability of filling Coscia's orders. But exactly what that probability was and whether Defendants were aware of it (and what actions they took in response) are all relevant factors in determining whether Defendants possessed an intent to defraud other market participants when the Subject Orders were placed. At this stage, however, the allegations in the indictment must be taken as true, and it will be up to the jury to decide whether the government has proven beyond a reasonable doubt that Defendants acted with the requisite intent to defraud when posting their orders. *Morissette v. United States*, 342 U.S. 246, 274 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury.")

The cases cited by Defendants do not dictate a different result. In *Sullivan & Long*, the Seventh Circuit held that the defendant, who had sold short more shares of a company than were outstanding, was not liable for securities fraud because "the plaintiffs could not count on the volume of short sales being capped at the total number of shares outstanding." 47 F.3d at 863. "They were on notice that the sort of

---

approximately 1,600%, while the ratio for other traders was typically between 91% and 264%. *Id.* at 789.

thing that did happen might happen . . . they were not deceived." *Id.* By contrast, here, the indictment alleges that, by submitting large orders that they intended not to fill, Bases and Pacilio artificially moved the market in a way that deceived other market participants. *See Coscia*, 866 F.3d at 800 (distinguishing *Sullivan & Long*).

In *ATSI Communications*, the plaintiff relied upon a pattern of short-selling with accompanying drops in stock price to allege that defendants had fraudulently manipulated the market. 493 F.3d at 96–97. The Second Circuit disagreed. Starting with the unremarkable premise that "short selling—even in high volumes—is not, by itself, manipulation," the court recognized that market deception arises from the fact that investors are misled to believe "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* at 100 (internal quotations and citation omitted). This is precisely what the government alleges here—that Bases and Pacilio upset the "natural interplay of supply and demand" by using the Subject Orders to inject false supply and demand information into the market. *See id.*

Similarly, in *GFL Advantage Fund, Ltd. v. Colkitt*, the Third Circuit held that a claim of securities market manipulation requires plaintiff "to establish that the alleged manipulator injected inaccurate information into the market or created a false impression of market activity." 272 F.3d 189, 205 (3d Cir. 2001) (internal quotations and citation omitted). Again, that is what the indictment charges here.[7]

---

[7] *United States v. Finnerty* also is distinguishable, because the government in that case had presented at trial no "proof of manipulation or a false statement, breach of duty to disclose, or deceptive communicative conduct," 533 F.3d 143, 150 (2d Cir. 2008); *see Coscia*,

Lastly, the Court finds compelling the *Coscia* court's discussion of *Radley*, 632 F.3d 177, and *CP Stone*, 2016 WL 5934096. *See* 866 F.3d at 797 n.64. There, the Seventh Circuit aptly observed that, in neither case, did the government allege that the defendants had created "the illusion of artificial market movement that included the use of large orders to inflate the price while also taking steps to avoid transactions in the large orders." *Id.* That is precisely the crux of the government's case here.

Before moving on, it is necessary to address Defendants' argument that the Subject Orders could not have deceived other market participants as a matter of law, because the participants would have been aware of the possibility that the Subject Orders had been placed without any intent to fill them. In support, Defendants point to other trading devices—such as "iceberg orders" and "partial-fill orders—that are common trading practices in the commodity futures markets.

In brief, "iceberg orders" apportion large orders into smaller orders, *Coscia*, 866 F.3d at 800 n.80; while "partial-fill orders" are programmed to cancel the balance of an order once a predetermined portion is filled, Def. Pacilio's Mem. at 12. In both cases, the orders are "designed to be executed under certain circumstances." *Coscia*, 866 F.3d at 800. Put another way, the party submitting these types of orders intends to fill the order up until a certain condition is met (if the condition is triggered at all). Defendants hope to analogize their conduct to such orders, noting "the government does not explain why a trader cannot place an order with *both* the intent to cancel in the future *and* a willingness to trade in the meantime." Defs.' Joint Reply at 4, ECF

---

866 F.3d at 800 (distinguishing *Finnerty*). Here, this is the core of the government's allegations, and whether it can prove it will be left to trial.

No. 144 (emphasis in original). But that is not the conduct the government challenges here. Rather, what the government claims is that Bases and Pacilio submitted the Subject Orders with the intent to *not* fill them—that is, with no "willingness to trade [them] in the meantime." *See Coscia*, 866 F.3d at 795 ("The fundamental difference is that legal trades are cancelled only following a condition subsequent to placing the order, whereas orders placed in a spoofing scheme are never intended to be filled at all.").

Defendants' second argument flows from the first. They contend that, because the government's case is premised not on affirmative misrepresentations, but material omissions (that is, Defendants' failure to inform the marketplace that they had no intention of filling the Subject Orders when they placed them), the wire fraud counts must be dismissed, because a fraud charge cannot be based upon an omission absent a duty to disclose. But Defendants' crabbed view of the wire fraud statute is incorrect.

Like other circuits, the Seventh Circuit has construed the wire fraud statute broadly. *See United States v. Weimert,* 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he wire fraud statute has been interpreted to reach a broad range of activity."); *see also United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (statutory language in wire fraud statute is "broad enough to include a wide variety of deceptions intended to deprive another of money or property") (internal quotations and citation omitted). And, so construed, the statute prohibits "not only false statements of fact but also misleading half-truths and knowingly false promises" and "can also include the omission or

16

concealment of material information, *even absent an affirmative duty to disclose*, if the omission was intended to induce a false belief and action to the advantage of the schemer." *Weimert*, 819 F.3d at 355 (emphasis added). And so, "actionable deception can include false statements of fact, misleading half-truths, deception omissions, and false promises of future action." *Id.* at 357[8]; *see also Faruki,* 803 F.3d at 852 (wire fraud requires "the making of a false statement or material misrepresentation, *or* the concealment of a material fact" (citing *United States v. Stephens,* 421 F.3d 503, 507 (7th Cir. 2005)) (emphasis added); *United States v. Morris,* 80 F.3d 1151, 1160–61 (7th Cir. 1996)) (mail and wire fraud statutes "apply not only to false or fraudulent representations, but also to the omission or concealment of material information, even where no statute or regulation imposes a duty of disclosure") (internal citations omitted); *United States v. Dial*, 757 F.2d 163, 169 (7th Cir. 1985) (upholding conviction of commodities future brokers for wire fraud because "their trading an unmargined account was an active misrepresentation and hence actionable even without a breach of fiduciary duty"); *United States v. Hollnagel,* 955 F. Supp. 2d 830,

---

[8]     In *Weimert*, the Seventh Circuit recognized the broad reach of the wire fraud statute, but noted that the statute is not without its limits, holding that the statute does not criminalize a person's "lack of candor about the negotiating positions of parties to a business deal" where the parties' negotiating positions were not "likely to affect the decisions of a party on the other side of the deal." 819 F.3d 351, 356–57 (7th Cir. 2016). By contrast, here, Bases's and Pacilio's actions are alleged to have induced other market participants to buy or sell precious metals futures contracts at times, prices, and quantities that they otherwise would not have. Indictment, Count 1 ¶¶ 9–12.

843 (N.D. Ill. 2013) (rejecting an argument that an omission cannot constitute wire fraud in the absence of a duty because "no such absolute requirement exists").[9]

The indictment at issue claims that Bases and Pacilio engaged in an effort to "deceive other market participants by injecting materially false and misleading information into the . . . market that indicated increased supply or demand in order to induce market participants to buy or sell . . . contracts at prices, quantities, and times that they would not have otherwise."  Indictment, Count I ¶ 3.  They did so, the government says, by submitting large orders even when they intended never to fill them in order to artificially move the market price.  These allegations are sufficient to withstand a challenge at the pleading stage, and Defendants' motion to dismiss the wire fraud charge as insufficiently pleaded is denied.

### 2.  Commodities Fraud

Next, Defendants argue that the indictment fails to adequately plead commodities fraud.  The statute criminalizes executing, or attempting to execute, a "scheme or artifice" (1) "to defraud any person in connection with any commodity for future delivery," 18 U.S.C. § 1348(1), or (2) "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery," 18 U.S.C. § 1348(2).  The indictment charges Defendants with violating both provisions.

---

[9]  *Reynold v. East Dyer Dev. Co.*, 882 F.2d 1249 (7th Cir. 1989), and *United States v. Dick*, 744 F.2d 546, 550 (7th Cir. 1984), do not help Defendants.  In *Reynolds*, the Seventh Circuit found "no active or elaborate steps to conceal" or a "failure to disclose part of a larger pattern of lies or half-truths."  882 F.2d at 1253.  In *Dick*, the Seventh Circuit affirmed the defendants' convictions of mail fraud, holding, *inter alia*, that even "[r]eckless disregard for truth or falsity is sufficient to sustain a conviction for mail fraud."  744 F.2d at 551.

As before, Bases and Pacilio argue that their orders presented genuine market risk and would have been executed if accepted and, therefore, cannot constitute fraud as a matter of law. But this is just the same argument presented above, and it fails for the same reasons.

Next, Defendants contend that, in order to plead commodities fraud, there must be an allegation of market manipulation, and open-market orders subject to market risk cannot be manipulative. Def. Bases's Mem. at 9, ECF No. 117; Def. Pacilio's Mem. at 12–13. Defendants, however, fail to cite any support for the notion that 18 U.S.C. § 1348 requires market manipulation. Rather, their argument rests on civil cases interpreting 17 C.F.R. § 240.10b, SEC Rule 10b-5, or 15 U.S.C. § 78i, which explicitly require manipulation. *See, e.g., Sante Fe Indus. v. Green,* 430 U.S. 462, 476–77 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 185 (1976); *ATSI Commc'ns,* 493 F.3d at 101; *GFL Advantage Fund,* 272 F.3d at 199; *Sullivan & Long,* 47 F.3d at 864–65; *CP Stone,* 2016 WL 5934096, at *1.

On the other hand, 18 U.S.C. § 1348 by its terms does not. *Compare Coscia,* 866 F.3d at 796–97 (explaining that § 1348 requires fraudulent intent, a scheme or artifice to defraud, and a nexus to a security without requiring manipulation or deception), *with Santa Fe Indus.,* 430 U.S. at 473–74 (explaining that a cause of action under § 10b and Rule 10b-5 succeeds "only if the conduct alleged can be fairly viewed as manipulative or deceptive within the meaning of the statute") (internal quotations and citation omitted), *and ATSI Commc'ns.,* 493 F.3d at 101 (explaining

that market manipulation under § 240.10b-5 requires six elements, including "manipulative acts").

Finally, Pacilio argues that spoofing cannot constitute grounds for fraud because Congress deliberately chose to create a separate anti-spoofing statute, namely 7 U.S.C. § 6c(a)(5)(C) ("It shall be unlawful for any person to engage in conduct . . . commonly known to the trade as . . . "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution.)".  He posits that, if Congress had intended spoofing to equate to fraud, "there would be no reason to create an entirely new category of conduct and place it in a section . . . separate and apart from" the fraud statutes.  Def. Pacilio's Mem. at 10.

But this argument rests on the false premise that the indictment equates spoofing to fraud.  It does not.  Rather, the indictment alleges conduct sufficient to give rise to spoofing *and* fraud.  Spoofing is a prosecutable offense under 7 U.S.C. § 6c(a)(5)(C) when someone engages in "bidding or offering with the intent to cancel the bid or offer before execution," but such conduct may also be implicated in a larger scheme where, as here, spoofing was allegedly used in a "scheme to defraud" to obtain money or property by means of "false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1348.  And the notion that the same conduct may be chargeable as multiple different crimes is nothing new.  *See, e.g., Sloan,* 492 F.3d at 884 (affirming conviction of both mail and wire fraud).  What is more, *Coscia* scotches the argument by upholding a conviction of both spoofing and commodities fraud.  866 F.3d at 661.  Accordingly, this basis for dismissal also is denied.

**B.      Statute-of-Limitations Challenge**

Commodities fraud has a statute of limitations of six years.  18 U.S.C. § 3301. Because the indictment was returned on July 17, 2018, the limitations period extends back to July 17, 2012.  Here, the indictment alleges that Bases and Pacilio each committed commodities fraud from "June 2009 and continuing through at least in or around January 2014."  Indictment Count 2 ¶ 20; *id.* Count 3 ¶ 22.  And so, Defendants assert that at least a portion of the commodities fraud counts (presumably, the portion that allegedly took place before July 17, 2012) must be dismissed.

In support, Bases and Pacilio rely on *United States v. Yashar*, 166 F.3d at 875. In that case, the defendant had received wages for ostensibly serving as a City of Chicago committee member from June 1, 1989, until September 1, 1992, when in fact he had performed little to no work during this time.  This "ghost payroller" was charged with one count of violating 18 U.S.C. § 666 for misappropriating government property valued at more than $5,000 during a one-year period in which the City of Chicago received more than $10,000 in federal benefits.  *Id.*  The time period encompassed by the charge was between September 1, 1991, and September 1, 1992, and the operative return date of the indictment was August 13, 1997.  Because § 666 has a five-year limitations period, Yashar moved to dismiss the portion of the charge that was based upon conduct prior to August 13, 1992.  The district court agreed.

On appeal, both sides acknowledged that the "continuing offense" doctrine enunciated by the Supreme Court in *Toussie v. United States*, 397 U.S. 112, 115

21

(1970), did not apply.[10]  Nonetheless, the government argued that an indictment should be deemed timely so long as a single act within the continuing course of conduct occurred after the limitations cut-off date, even if that act did not satisfy all the elements, or any element in its entirety, of the charged offense within the limitations period.  *Id.* at 876.  For his part, Yashar asserted that the government must establish that all elements of the crime occurred within the limitations period. *Id.*

The Seventh Circuit rejected both arguments, holding "that for offenses that are not continuing offenses under *Toussie*, the offense is committed and the limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct."  *Id.* at 879–80.  Because it was unclear from the indictment whether the government was alleging that at least $5,000 was taken by Yashar and $10,000 in benefits received by the City before the limitations period had expired, the *Yashar* court vacated the district court's denial of the motion to dismiss and remanded for further proceedings. *Id.* at 880.

*Yashar* is similar to this case in one respect.  The parties here agree that the commodities fraud is not a continuing offense under *Toussie*.  But, this is where the similarity ends.  Unlike the ghost payrolling crime charged in *Yashar*, the crime of

---

[10]     The Supreme Court in *Toussie* held that an extension of the limitations period under the continuing offense doctrine should not be permitted "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing [offense]."  397 U.S. at 115 (internal quotations and citations omitted).

commodities fraud is a scheme offense, and this distinction is fatal to Defendants' position. *Compare* 18 U.S.C. § 1348, *with* 18 U.S.C. § 666. The Court finds *United States v. Longfellow*, 43 F.3d 318 (7th Cir. 1994), instructive.

In *Longfellow*, the government charged the defendant with bank fraud under 18 U.S.C. § 1344, alleging that he had engaged in a scheme to defraud a credit union (where he was the President and Chief Operative Officer) by approving loans to facilitate the sale of properties that he himself owned; failing to properly record the sales; keeping the deeds in his own name, rather than transferring them to the credit union or the purchaser; and concealing his interests from other credit union directors. *Id.* at 319. The indictment listed six separate loans that were closed between April 1982 and February 1984 and alleged a separate refinancing of one of the loans in April 1985 as the "execution" of the scheme. *Id.* at 322.

The indictment was issued in November 1992, and, due to a statutory amendment, could only encompass acts that occurred after August 1984. *Id.* As such, the defendant moved to dismiss the charge, arguing that each of the six loans at issue were outside the limitations period. *Id.* He also argued that the April 1985 refinancing of a previous loan was merely a continuation of a 1983 loan, which was barred, and thus could not extend the limitations period. *Id.* at 324–25. The district court disagreed, and the Seventh Circuit affirmed. *Id.* at 326.

Noting that the bank fraud statute "punishes each execution of a fraudulent scheme rather than each act in furtherance of such a scheme," *id.* at 323 (internal quotations and citations omitted), the Seventh Circuit held that the 1985 refinancing

23

constituted a separate "execution" of the charged bank fraud, because it created a new, independent risk for the credit union. *Id*. at 324–25. And, because the 1985 refinancing was within the limitations period, "[t]he fact that only one or two executions fell within the Statute of Limitations does not detract from the entire pattern of loans' being a scheme, and renders Longfellow no less culpable for the entire scheme." *Id*. at 325.

Here, the government alleges that Bases engaged in a scheme to commit commodities fraud with executions occurring from June 2009 through at least January 2014, and that Pacilio engaged in a scheme with executions occurring from August 2009 through at least October 2014. Indictment Count 2 ¶ 20; *id*. Count 3 ¶ 22. Furthermore, according to the indictment, each execution of the scheme—a number of which occurred after July 17, 2012—created new and different risks for other market participants, and each execution was chronologically and substantively independent with its own function and purpose. *See* Indictment Count 1 ¶ 3; *id*. Count 2 ¶ 19–29; *id*. Count 3 ¶¶ 21–22. Accordingly, if the allegations are proven true, Defendants would be liable for the entire scheme, even if some of the conduct at issue occurred prior to July 2012. *See, e.g., Longfellow*, 43 F.3d at 322–25; *United States v. O'Brien,* No. 17 CR 239, 2018 WL 4205472, at *15 (N.D. Ill. Sept. 4, 2018) (finding that at least one execution of a mail and bank fraud scheme falling within the limitations period "brings the entire scheme within the statute of limitations"). Thus, Defendants' motion based upon the statute of limitations is denied.

24

## C.     Defendants' Constitutional Arguments

Defendants next argue that the commodities and wire fraud statutes are unconstitutionally vague as applied to them in violation of the Fifth Amendment's guarantee of fair notice.  Pacilio also contends that the anti-spoofing statute, 7 U.S.C. § 6c(a)(5)(C), is an unconstitutional restriction on commercial speech and ensnares truthful speech in a way that is disproportionate to the government's interest in preventing spoofing.

### 1.     Fair Notice Challenge

To satisfy due process, a criminal statute must "'define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Skilling v. United States,* 561 U.S. 358, 402–03 (2010) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)).  Furthermore, a vagueness challenge "not premised on the First Amendment is evaluated as-applied, rather than facially."  *United States v. Calimlim*, 538 F.3d 706, 710–11 (7th Cir. 2008) (citing *Chapman v. United States,* 500 U.S. 453, 467 (1991)).  And, in conducting this analysis, courts must consider "the statute, either standing alone or as construed" to see if it was "reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier,* 520 U.S. 259, 267 (1997).  Moreover, it is important to note that "a scienter requirement in a statute alleviate[s] vagueness concerns."  *McFadden v. United States,* 135 S. Ct. 2298, 2307 (2015) (internal quotations and citation omitted).

25

Defendants contend that applying the commodities and wire fraud statutes to their conduct is void for vagueness, because the statutes had never been applied to spoofing prior to Coscia's indictment in 2014. According to Defendants, to the extent that their alleged spoofing activities predated *Coscia*, they could not have known that this conduct constituted a crime. Defendants also argue that the statutes themselves fail to give notice that spoofing might count as fraud, especially given that Congress categorized spoofing as a "disruptive practice" in 7 U.S.C. § 6c(a)(5)(C), rather than fraud.

The same challenge to the commodities fraud statute was rejected by the district court in *Coscia*, 100 F. Supp. 3d 653 (N.D. Ill. 2015), *aff'd*, 866 F.3d 782 (7th Cir. 2017). Like Defendants here, Coscia claimed an absence of authority "that could have provided reasonable notice that [his] trading activity might be considered a form of fraud at the time of that activity." *Id.* at 661. But the district court "declin[ed] to conclude, based solely on the scarcity of cases interpreting [the commodities fraud statute] that the statute fails to provide a person of ordinary intelligence fair notice of the conduct that it prohibits," finding that the indictment, which alleged false impressions, fraudulent inducement, and tricking others, was "consistent with [a] scheme to defraud . . . ." *Id.*

Similarly, the present indictment alleges that Defendants presented false and misleading information to market participants, inducing them to execute transactions that inured to Defendants' financial benefit. Indictment, Count 1 ¶¶ 2(b)–11. That the fraud also constitutes spoofing is of little moment because the

26

alleged conduct describes a scheme to defraud as defined by the commodities fraud statute and construed by ample case law at the time the conduct took place. Pacilio concedes as much in his brief. Def. Pacilio's Mem. at 14 ("The commodities fraud and wire fraud statutes were actively enforced long before the passage of Dodd-Frank."). Thus, the Court concludes that the statute is sufficiently definite to give an ordinary person notice that such conduct could be charged as commodities fraud. *See Coscia*, 100 F. Supp. 3d. at 661.

Defendants' contention that the wire fraud statute does not provide fair notice falters for the same reason. In pertinent part, the wire fraud statute requirements mirror those of the commodities fraud statute. Both the commodities fraud and wire fraud statutes require a scheme or artifice to defraud. 18 U.S.C. §§ 1343, 1348. In addition, the definition of a scheme to defraud is the same under both statutes. *Compare* Jury Instructions, *United States v. Coscia,* 14 CR 551, ECF No. 85 (defining a scheme to defraud to establish commodities fraud as "a plan or course of action intended to deceive or cheat another"), *with* 7th Cir. Pattern Fed. Jury Instr., Crim. (2012 ed.) for 18 U.S.C. §§ 1341 and 1343 (defining a scheme to defraud to establish wire fraud as "a scheme that is intended to deceive or cheat another"). Accordingly, there is no reason to believe that *Coscia*'s holding as to the commodities fraud statute also would not apply to the wire fraud statute.

It is true, as Pacilio points out, that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," *see Lanier,* 520 U.S.

at 266. But the wire fraud statute makes criminal "a scheme or artifice to defraud . . . by means of false or fraudulent pretenses, representations, or promises" for the purpose of "obtaining money or property" using electronic communications. 18 U.S.C. § 1343. Regardless of the novelty of the conduct, so long as it falls within the statute's plain language, as is the case here, there is fair notice. *See United States v. Walters*, 711 F. Supp. 1435, 1438 (N.D. Ill. 1989) (rejecting due process challenge where alleged fraud scheme to obtain college scholarships by mailing falsified eligibility information presented a case of first impression). Furthermore, because the statute is not ambiguous as applied to Defendants' conduct, the rule of lenity does not apply. *Lanier,* 520 U.S. at 266 (explaining that the rule of lenity requires *ambiguity* in a criminal statute to be resolved in favor of lenity).

Defendants also cite to *Skilling v. United States*, 561 U.S. at 402–03, and *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012). Both are unavailing. In *Skilling,* the Supreme Court determined, as a matter of first impression, what types of schemes qualified as honest-services fraud. *Skilling*, 561 U.S. at 408–09. In *Fox*, the Supreme Court considered an "abrupt change" in an agency's previous interpretation of a regulation. Here, however, the term "scheme or artifice to defraud" as it appears in federal fraud statutes has been interpreted broadly and consistently over the years. *See, e.g., Pasquantino v. United States*, 544 U.S. 349, 377 (2005) (interpreting "scheme or artifice to defraud" expansively to prohibit foreign tax law fraud); *Durland v. United States*, 161 U.S. 306, 313 (1896) (extending wire fraud to "everything designed

to defraud by representations as to the past or present, or suggestions and promises as to the future").

For these reasons, Defendants' motions to dismiss the indictment on vagueness grounds is denied.

### 2. Commercial Speech Challenge

Next, Pacilio argues that the anti-spoofing statute is an unconstitutional restriction on commercial speech. Commercial speech is "speech that proposes a commercial transaction" and is protected by the First Amendment, albeit to a lesser degree than noncommercial speech. *Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 515–16 (7th Cir. 2014); *see also Bd. of Trs. of State Univ. of New York v. Fox,* 492 U.S. 469, 477 (1989) ("[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression.") (internal quotation marks omitted).

That said, false and misleading commercial speech is not entitled to any First Amendment protection. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 563 (1980). For this reason, the government "may ban forms of communication more likely to deceive the public than to inform it or commercial speech related to illegal activity." *Id.* at 563–64 (citations omitted). Only if the speech is "neither misleading nor related to unlawful activity" is the government's regulation power limited. *Id.* at 564.

29

To guide the lower courts, the Supreme Court in *Central Hudson* developed the following test. First, the court must ask whether the commercial speech in question is lawful and not misleading and whether the asserted government interest in regulating the speech is substantial. *Id.* at 566. If the answer to both of these questions is yes, the court must determine whether the regulation "directly advances" the government's asserted interest and whether it is "not more extensive than necessary to serve that interest." *Id.*

Pacilio argues that the anti-spoofing statute's ban on "bidding or offering with the intent to cancel the bid or offer before execution," 7 U.S.C. § 6c(a)(5)(C), ensnares truthful commercial speech in a way that fails the *Central Hudson* test. But this argument fails for a number of reasons.

As a preliminary matter, Pacilio misapprehends the conduct that the statute prohibits. As the government notes, the anti-spoofing provision prohibits traders from placing orders that "are never intended to be filled at all." *Coscia*, 866 F.3d at 795. This distinguishes such orders from other lawful orders, such as "fill-or-kill" and "stop-loss" orders, that "are designed to be executed upon the arrival of *certain subsequent events*." 866 F.3d at 795 (emphasis in original).[11]

---

[11]     Pacilio also refers to "hedge," "ping," and "price discovery" orders and contends that they are subject to the anti-spoofing provision because a trader places them with the intent to cancel them before execution. Def. Pacilio's Mem. at 21; Def. Pacilio's Reply Mem. 8–9, ECF No. 145. But he does not elucidate whether such orders "are never intended to be filled at all." Def. Pacilio's Mem. at 21; Def. Pacilio's Reply Mem. 8–9. In fact, from his own description of these orders, the opposite appears to be true. When discussing hedge orders, Pacilio explains that they are placed "for risk management purposes" but are cancelled when the market "move[s] in a favorable direction." Def. Pacilio's Mem. at 21. He explains that ping orders are placed to explore market depth, suggesting that they are cancelled if there was insufficient depth. *Id.* And he states that price discovery orders are placed for the

30

Operating under this faulty understanding, Pacilio next contends that the anti-spoofing statute regulates truthful speech, because all open-market orders accurately reflect to market participants the terms on which they can be filled. But this is the same argument he has made before, just under a different guise. In the scheme described in the indictment, the Subject Orders do not constitute truthful speech, but fraudulent speech. This is so because (it is alleged) Defendants intended not to fill them *at the time that the orders were placed*. Again, this is precisely the type of speech and conduct that the Seventh Circuit considered fraudulent in *Coscia*, 866 F.3d at 787, and fraudulent commercial speech is not entitled to First Amendment protection. *See United States v. Alvarez*, 567 U.S. 709, 723 (2012) ("[F]raudulent speech generally falls outside the protections of the First Amendment[.]).[12]

Furthermore, Pacilio's argument presumes that the anti-spoofing statute targets speech—that is, the terms of the offer or bid when it is posted. This too is incorrect. The statute is directed not at speech, but at the *conduct* of the trader using the speech, namely, the placing bids or orders in the commodities market with the intent to not fill them at all. Indeed, "it has never been deemed an abridgement of

---

purpose of exploring market liquidity, and, therefore, would presumably only be cancelled if there was insufficient market liquidity. *Id.*

[12] For this reason, Pacilio's reliance upon *Edenfield v. Fane,* 507 U.S. 761 (1994), is misplaced. Def. Pacilio's Mem. at 22; Def. Pacilio's Reply at 7–8, ECF No. 145. In *Edenfield*, the Supreme Court struck down a regulation banning all personal solicitation of customers by accountants, including truthful and nonmisleading communications. *Id.* at 777. The *Edenfield* court, however, distinguished blanket bans from bans of fraudulent or deceptive commercial expression, stating that the government "may ban commercial expression that is fraudulent or deceptive without further justification." *Id.* at 768–69.

freedom of speech . . . to make *a course of conduct* illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)) (emphasis added). Put another way, the government "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.*

Examples of such statutory limitations on speech (or, more accurately, the use of speech) abound. Take, for example, governmental restrictions placed upon "the exchange of information about securities," "corporate proxy statements," or "the exchange of price and production information among competitors." *Id.* (citations omitted).[13] Similarly, here, the anti-spoofing statute does not regulate speech *per se—i.e.,* the terms that a trader must use when placing bids or offers—instead, it prohibits the fraudulent conduct of using the instrumentality of speech to create an illusion that supply and demand are at certain levels, when they are not.

For these reasons, Defendants have failed to establish that the anti-spoofing provision is unconstitutional under the *Central Hudson* test.

---

[13] Just to expand on the last example, when competitors exchange communications regarding the prices that they will charge for competing products, the information is truthful (it must be for the price-fixing conspiracy to succeed), but the act of exchanging such information is prohibited by antitrust laws. *See, e.g., Am. Column & Lumber Co. v. United States,* 257 U.S. 377, 392, 412 (1921) (finding that an industry plan to disclose price and quantity information amongst industry members for the alleged purpose of gaining accurate knowledge of market conditions was subject to regulation to avoid using that information to artificially raise prices).

## IV. Conclusion

For the foregoing reasons, Defendants Bases's and Pacilio's Motions to Dismiss the Indictment are denied.

**IT IS SO ORDERED.**                    **ENTERED  5/20/20**

_____

**John Z. Lee**
**United States District Judge**

33