## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 CR 48-1, 2 |
| | ) | |
| EDWARD BASES and JOHN PACILIO, | ) | Judge John Z. Lee |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Edward Bases and John Pacilio were tried and found guilty by a jury on charges of wire fraud and conspiracy to commit wire fraud. Pacilio also was found guilty of commodities fraud.[1] Defendants have moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Rule 33. For the reasons provided below, their motions are denied.

### I.    Factual and Procedural Background

Bases and Pacilio were traders in various commodity futures markets for at least fourteen years. During that time, Bases traded precious metals futures while employed at Deutsche Bank and then Bank of America Merrill Lynch; Pacilio traded precious metals futures at Deutsche Bank, Bank of America Merrill Lynch, and then Morgan Stanley.

---

[1] The jury acquitted Pacilio of violating 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2), and Bases of violating commodities fraud under 18 U.S.C. § 1348.

According to the third superseding indictment, when Defendants worked together at Bank of America Merrill Lynch, they conspired to engage in a fraudulent scheme to artificially move the prices in certain commodity futures markets on the Chicago Mercantile Exchange ("CME") in order to facilitate the execution of certain transactions that they wanted to fulfill. Defendants then conspired to continue this scheme once they went their separate ways.

More specifically, the government asserts, Defendants placed large orders in various commodity futures markets with the intent not to execute them, which induced other market participants to buy or sell futures contracts at prices that they otherwise would not have, in a way that benefited Defendants financially. This scheme comprised of several steps. *See generally* Tr. at 221:13–227:9, ECF No. 635; Tr. 652:15–665:1, ECF 636.

First, Defendants placed orders (in the form of bids or offers) that they actually wanted to trade (I will refer to these as the "Intended Orders").[2] Usually, these took the form of "iceberg" orders.[3]

Second, Defendants placed orders on the opposite side of the market as the Intended Orders with the intent to cancel the orders prior to execution. These orders (which I will call the "Subject Orders") were typically large visible orders, and

---

[2] An order to buy on the CME is a "bid," and an order to sell is an "offer." Tr. at 74:6–12, ECF No. 634.

[3] An iceberg order is a large order that is split up into a series of smaller orders in order to "obscure the true extent of supply or demand" for a particular position. *United States v. Coscia*, 866 F.3d 782, 800 (7th Cir. 2017) (citation omitted), *cert. denied sub nom. Coscia v. United States*, 138 S. Ct. 1989 (2018).

Defendants placed them for the sole purpose of driving the market price toward the price of the Intended Orders. The Subject Orders gave the illusion that the demand or supply in the particular market was greater than it actually was.

Third, this illusion of market activity prompted other traders to react, causing the market price to move toward Defendants' Intended Orders. This price movement eventually led traders to execute the Intended Orders at the prices Defendants wanted.

Fourth, Defendants then cancelled the Subject Orders before they were filled, just as they had planned.

In addition to the conspiracy charge, the superseding indictment also accused Bases and Pacilio individually of engaging in wire fraud affecting a financial institution from around 2008 to at least 2014. Additionally, the indictment charged Defendants with engaging in commodities fraud from at least May 20, 2009, through at least January 2014. Lastly, the indictment charged Pacilio with violating the anti-spoofing statute, 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2), on April 17, 2014.

The government's case-in-chief spanned eight days. Altogether, the government presented evidence of approximately seventy trading episodes involving at least one of the Defendants, twenty-two of which were accompanied by recorded, contemporaneous online chats. The jury also heard testimony from two CME directors familiar with the CME's trading practices and rules; an econometrician who summarized Defendants' trading episode data; a cooperating witness who recounted, among other things, that Bases and Pacilio had taught him about the scheme and

how to execute it; compliance officers from Deutsche Bank and Bank of America Merrill Lynch; two victims of the scheme; and an FBI agent who specializes in investigating security and commodities fraud.

After the government rested its case, Defendants moved for a judgment of acquittal as a matter of law under Rule 29. The Court took the motions under advisement.

Pacilio then presented one witness, Daniel Fischel, a professor emeritus of University of Chicago Law School and president of Compass Lexecon, an economic consulting firm. Dr. Fischel testified that there is nothing wrong with placing a large visible order into the market opposite an iceberg order and that a person placing a large visible order has no idea how other traders will react. He also analyzed Pacilio's trading episodes and opined that the government's analysis inaccurately portrayed Pacilio's trading behavior, because it focused only those episodes where he cancelled large visible orders that were opposite iceberg orders.

After deliberations, the jury found Bases guilty as to Count 1 (conspiracy) and Counts 2 through 10 (wire fraud), but it found him not guilty on Count 18 (commodities fraud). As to Pacilio, the jury found him guilty as to Count 1 (conspiracy), Counts 11 through 17 (wire fraud), and 19 (commodities fraud), and not guilty on Count 20 (spoofing).

Each Defendant has filed a renewed motion for acquittal under Rule 29 or, in the alternative, for a new trial under Rule 33. Inasmuch as each motion raises different issues, each Defendant has adopted the arguments of the other.

## II.    Statutory Background

Bases and Pacilio were charged with and convicted of conspiracy to commit wire fraud affecting a financial institution under 18 U.S.C. § 1343. Additionally, Pacilio was charged with and convicted of commodities fraud under 18 U.S.C. § 1348.

The wire fraud statute, § 1343, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation . . . affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years or both.

The commodities fraud statute, § 1348(2), states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery . . . shall be fined under this title, or imprisoned not more than 25 years, or both.

## III.    Analysis

### A.    Rule 29 Motions for a Judgment of Acquittal

Under Rule 29, a court may, after a jury has returned a guilty verdict, set aside the verdict and "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). Challenging the sufficiency of the evidence in such instances is a "heavy, indeed, nearly

5

insurmountable burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). Bases and Pacilio each must convince this Court "that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted). In other words, the record must be devoid of any evidence from which a reasonable jury could have found him guilty. *Id.* "[W]e do not reweigh evidence or reassess the credibility of witnesses; these are jury determinations to which we defer." *United States v. Griffin*, 194 F.3d 808, 816 (7th Cir. 1999).

Defendants argue there was insufficient evidence for a rational jury to find that they had engaged in or had conspired to engage in a scheme to defraud in violation of the wire fraud statute. Additionally, Defendants argue that the wire fraud statute is unconstitutionally vague as applied to their conduct.

### 1. Whether There Was Sufficient Evidence of Wire Fraud

Bases and Pacilio challenge the sufficiency of the trial evidence to support wire fraud in three ways. First, they argue that the government failed to prove that the Subject Orders were fake or fraudulent. Second, they assert that, even if the government had proven the foregoing, it still failed to establish that any pretense, representation, or promise the Subject Orders conveyed was material. Third, Defendants contend that the government failed to prove that, by placing an order on the CME, a trader implicitly conveys an intent to trade on that order or that either Defendant had intended to defraud anyone.

6

### a.    False Pretenses, Representations, or Promises

Defendants first argue that the government failed to present any evidence that their Subject Orders were in any way fake or fraudulent.  They are mistaken.  To the contrary, the government presented numerous witnesses and documents demonstrating that, at the time that Bases and Pacilio had placed the Subject Orders, CME rules required that any order placed on the exchange represented a genuine, bona fide intent to trade at the specified quantity and price.

By way of example, Harnaik Lakhan, a trader who worked under Defendants at Bank of America Merrill Lynch, explained in detail how Bases and Pacilio carried out the trading scheme, by placing orders they intended to cancel for the sole purpose of moving the market price towards the orders that they actually wanted to fill.  Tr. at 601:22–604:4.  Lakhan admitted that, with Defendants' guidance, he too placed orders with the intent to cancel them and that each time he did so, he was "providing the market incorrect information as to demand, supply, also my intent."  *Id.* at 598:7–12.  "[W]hen we place a spoof order," Lakhan testified, "you put in large quantity on one side.  So if you want to buy – if your intent is to buy, you place a large sell order, so that's – that's false supply in that instance."  *Id.* at 598:15–18.

Lakhan also noted that, in some instances, instead of one large spoof order, Bases placed multiple smaller spoof orders.  *Id.* at 661:2–662:19.  This had the advantage of minimizing suspicion and limiting the financial risk in the event that any of them were filled.  *Id.*; *see also id.* at 661:15–662:1 ("You don't want people to know it's a spoof order.  You want them to react to it.").  Under either approach,

Lakhan confessed, the sole intent behind a spoof order was to push the market price toward the intended order on the other side of the market that they wanted to fill. *Id.* at 599:2–20. According to him, Defendants carried out this scheme in the platinum, palladium, gold, and silver futures contract markets. *Id.* at 602:11–23.

The jury also heard from Robert Sniegowski, the Executive Director of CME's Rules and Regulatory Group. He testified that "the purpose of the market is to have integrity and . . . [to have] the bids and the offers represent people's desire to actually buy or sell at that price." Tr. at 220:7–9, ECF No. 635. For that reason, he emphasized that the CME always has required orders to be placed with an actual intent to buy and sell. *Id.* at 219:15–21. Sniegowski also stated that, since he joined the CME in 1989, the exchange has prohibited orders intended solely to create an artificial movement in price. *Id.* at 238:1–24; *see id.* at 229:1–2, 229:11–22, 231:13–19, 232:16–11, 233:3–18, 236:4–13; *see* GX220, CME Rule 432. According to Sniegowski, such orders mislead other market participants and disrupt the integrity of the market. Tr. at 231:5–12, 235:4–236:8, 247:7-9.

The government also presented John Scheerer, the Senior Director of the CME's Global Command Center. Scheerer testified that, based on his twelve years of experience at the CME and his decade of trading futures beforehand, he understood that each order placed on the CME was required to be a bona fide order placed with the intent to transact on that order. Tr. at 73:18–74:2, 91:13–19, 93:21–24, 94:4–19, 96:14–16, 97:2–6, 98:17–99:23, 181:22–24, 187:23–188:1. He explained that, while Defendants' executable orders were in the market, they were fake because "if your

intent was to cancel it before you even put it in, then . . . [it is] not a real order." Tr. at 185:9–23.[4]

In addition, the jury heard from compliance officers from two of Defendants' former employers. John Juul worked in Deutsche Bank's compliance department. He described the bank's commodities trading policies and how the bank communicated the policies to its traders. Juul testified that, while Bases was employed by Deutsche Bank from 2008 to 2010, its policies prohibited commodity traders from placing orders without an intent to execute them and from deceiving other market participants. *Id.* at 1097:1–1099:3, 1101:24–1106:3, ECF No. 639. Juul stated that Deutsche Bank adopted these policies to protect market participants and the market itself from harm. *Id.* at 1096:3–6.

Ed McLaren was Bank of America's chief compliance officer. He testified that the bank's employment agreements put Defendants on notice that the bank prohibited them from engaging in fraud, which subjected a trader to disciplinary action, termination, and financial penalties. *Id.* at 1238:20–1241:9, 1242:12–1243:1.

Lastly, the jury heard from numerous traders, who were injured by Defendants' fraudulent scheme. The traders explained that they understood orders

---

[4]    Pacilio points to Scheerer's testimony regarding so-called "fill-and-kill" orders for the proposition that traders are allowed to place an order with intent to cancel as long as it is paired with an order that the trader intends to execute. This is incorrect. A "fill-and-kill" order demands immediate execution or cancellation. Scheerer noted that, sometimes, when a trader places such an order, the entire order will be filled immediately if the quantity is available at the set price, and killed immediately if unavailable. Tr. at 160:1–20. At other times, the trader is willing to take whatever quantity is available at that price, but if a portion of the order is unavailable, then that portion is cancelled. *Id.* at 161:11–162:7. Under either scenario, the cancellation of the order depends on market conditions that are beyond the control of the individual trader placing the order.

on the CME to represent genuine intents to trade. David Pettey has worked at Susquehanna International Group since 2002. According to Pettey, he understood that, when trading on the CME, each "order[] represent[ed] bona fide interest in buying and selling" and that he "expected that people intended to actually trade at that price at that time." *Id.* at 1420:3–7, 1479:24–1482:24, ECF No. 640. Similarly, Anand Twells, a trader at Citadel Securities from 2006 to 2021, said that he understood that everybody "play[ed] by the rules of the exchange and plac[ed] orders with the intent to trade." *Id.* at 1577:9–25.

In sum, the government presented numerous competent witnesses who testified that they understood that placing orders on the CME with the intent to cancel them was prohibited conduct. Based on this testimony, a rational jury could conclude that the government had proven beyond a reasonable doubt that Defendants' Subject Orders constituted false pretenses, representations, or promises within the meaning of the wire fraud statute.

Defendants disagree and note that some of the orders in question in fact were executed. They are correct that a small percentage of the orders were filled. However, the trial evidence is sufficient for a reasonable jury to conclude that Bases and Pacilio had placed the Subject Orders with the intent to cancel them, even if they were not 100% successful in doing so.

Defendants also lean on *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022). There, the defendants—two Deutsche Bank derivatives traders—were convicted under the wire fraud statute for causing co-workers to submit false information to

10

the British Bankers' Association ("BBA") in order to manipulate the London Interbank Offered Rate ("LIBOR").[5] *Id.* at 842–43. This allowed the traders to profit on contracts that were dependent on changes in interest rates. *Id.* at 824.

In reversing their convictions, the Second Circuit noted that the BBA merely directed the banks to submit "the rate at which it *could* borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size." *Id.* at 835. The court observed that the government had failed to present any evidence that Deutsche Bank could not borrow at the rates that had been submitted to the BBA. *Id.* at 841. Furthermore, the court held that the BBA did not prohibit Deutsche Bank from considering the impact of its rate submissions on the profitability of its traders. *Id.*

By contrast, as discussed above, there is substantial evidence here from which a reasonable jury could find that Defendants' practice of placing orders on the CME with the intent to cancel them once their orders on the opposite side of the market were filled was fraudulent and deceptive. Accordingly, the Court denies their motions for a judgment of acquittal on this basis.[6]

---

[5]    LIBOR is a benchmark interest rate calculated from estimates submitted by the leading banks in London to the BBA. *Id.* at 824. To calculate the LIBOR for each loan duration (ranging from overnight to a year), the BBA receives rate submissions from sixteen panel banks, including Deutsche Bank. *Id.* at 825. The BBA eliminates the four highest and the four lowest rates and averages the middle eight rates to arrive at the LIBOR. *Id.* The LIBOR is then published globally each day. *Id.*

[6]    The Court previously rejected Defendants' argument that an open-market, tradeable order entered with the intent to cancel cannot be fraudulent as a matter of law. *See United States v. Bases*, No. 18-cr-48, 2020 WL 2557342, at *4–9 (N.D. Ill. May 20, 2020). Indeed, in light of the testimony and evidence at trial, a rational factfinder could conclude that Defendants, by repeatedly using large or multiple smaller visible orders to affect prices while taking steps to avoid transactions in those orders, deceptively created the illusion of market

### b. Materiality

Next, Defendants contend that, even if the Subject Orders were fraudulent, the government failed to prove that the orders were false in a material way. In support, Defendants point to Twells's and Pettey's testimony. Both used computer algorithms to trade futures contracts and acknowledged that their algorithms were not designed to determine the subjective intent behind an order placed on the CME. As such, Defendants argue, Twells's and Pettey's trading activity could not have been influenced by Defendant's subjective intent. *Id.* at 1467:7–9, 1504:24–1505:1. But this misunderstands their testimony.

In fact, Twells testified that Citadel's algorithm assumed that other traders were "playing by the rules of the exchange and placing orders with the intent to trade." *Id.* at 1577:9–25. He also believed that Bases's placement of three visible ten-lot offers on April 27, 2011, did influence Citadel's decision to trade with his iceberg bids. *Id.* at 1497:13–1500:18. Similarly, Pettey testified that Pacilio's placement of a visible 200-lot offer on September 22, 2010, "absolutely" was capable of influencing Susquehanna's trading algorithm to fill Bases's iceberg bid. *Id.* at 1428:17. Pettey further testified that Susquehanna's algorithm was affected by the various examples

---

movement. *See Coscia*, 866 F.3d at 797 (holding that a defendant's identical argument with regard to the commodities fraud statute "ignores the substantial evidence suggesting that he never intended to fill his large orders and thus sought to manipulate the market for his own financial gain" (cleaned up)); *see also United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022) ("Given the common ground between these two statutes, it is enough that *Coscia* establishes that this pattern of trading conduct is deceitful and aligns with the plain meaning of "scheme to defraud."). The holdings in *Coscia* and *Chanu* are binding on the Court, and Defendants' reliance upon extra-circuit authority is misplaced.

of Defendants' coordinated deceptive trading activity. *Id.* at 1435:24–1436:1. And both Twells and Pettey emphasized that, if traders were allowed to place orders with the intend to cancel them, such a practice would have a "bad" or "detrimental" effect on algorithmic trading platforms. *Id.* at 1426:3–6, 1488:24–25. A reasonable jury could find from such testimony that Defendants' fraudulent orders were material to the trading decisions made by other market participants.

In the same vein, Lakhan observed that the trading scheme influenced the trading decisions of others. "So, if I, for example," Lakhan stated, "place a spoof sell order, I'm pushing prices down, it's going to encourage somebody else to sell at a lower price than they otherwise would have done. Or even – it might even encourage them to come in when they're not going to trade otherwise." Tr. at 599:23–600:8. Bases himself concurred. *See* Gov't's Trial Ex. 47 (stating "that does show u how easy it is to manipulate it soemtimes [sic]" and stating "correct" and "I know how to 'game' this stuff" when responding to a fellow trader's text message, "basically you tricked alkll [sic] the algorhthm [sic]"); Gov't's Trial Ex. 64 (stating "I had to bid the systems to lose it."); Tr. at 778, ECF No. 637 (Lakhan's explaining that, under Bases's trading pattern scheme, "bid it to lose it" meant placing a spoof buy order in order to sell).

In light of this and similar evidence, Defendants have failed to establish that no rational factfinder could find that their Subject Orders were false to a material degree. *See, e.g.*, *Chanu*, 40 F.4th at 542 (holding that, because "traders employing manual spoofing do so with the aim (and effect) of influencing other actors in the trading space . . . . there is no question the traders' implied misrepresentations were

material"); *Coscia*, 866 F.3d at 800 (stating that materiality was established where defendant's large orders tricked trading algorithms by creating the illusion of an oversaturated market).

### c. Intent

Defendants also contend that the government presented insufficient evidence that, by placing an order, a trader implicitly conveys the intent to trade. They also argue that no reasonable jury could find from the trial evidence that Bases and Pacilio knew that their Subject Orders were unlawful or that they acted with the intent to defraud. But as discussed, the jury heard from numerous witnesses that traders on the CME were prohibited from placing orders with the intent to cancel them and that other traders reacted to orders based on the assumption that they were bona fide.

What is more, the jury also heard and saw evidence that Defendants themselves understood that their scheme was fraudulent. For instance, Bases admitted in chat messages after spoofing episodes that he "f…k[s] the mkt around a lot," that the market is "easy . . . to manipulate," that he "tricked" the algorithms, and that "we fkd a lot of people there." *See* GX 42, GX 56. A rational jury could conclude from Bases's own words that he possessed fraudulent intent when executing his scheme.

Additionally, Lakhan testified that, based on his understanding of futures trading, he knew that the scheme he learned from Bases and Pacilio was wrong because the fraudulent orders inserted false information into the market to the detriment of other traders. Tr. at 598:7–12, 599:23–600:8. Furthermore, the

14

financial institutions that employed Defendants informed them that conduct that created a misleading impression as to supply, demand, or price was prohibited. *See* GX 200, at DOJ-001369544; GX 203; GX 213; *see also* Tr. at 1109:6–15, 1109:23–1114:22, 1279:20–23, 1286:15–1287:1, 1288:10–1289:17, 1291:4–1292:24, 1293:3–1295:25, ECF Nos. 639, 640.

For their part, Defendants attempt to poke holes in the evidence in various ways. For instance, they highlight that, at times, they placed spoof orders at the top of the book where the risk of execution was highest. However, as Lakhan testified, the top of the book was "the best place to have maximum impact" when trying to move the price with spoofs. *See* Tr. at 1041:19. A reasonable jury certainly could have credited this testimony.

Defendants also point to Professor Fischel's testimony that placing visible orders on the opposite side of the market of iceberg orders was commonplace and not indicative of fraud. This testimony, however, focused solely on Pacilio's placement of iceberg orders opposite large visible orders. It ignored Pacilio's pattern of placing large visible orders and cancelling them as soon as his iceberg orders on the opposite side of the market were filled. Given this, a rational jury certainly could have discounted the value of Fischel's testimony.

Defendants also argue that, because they were manual traders who could not compete against the speed of algorithmic traders, the alleged scheme was nonsensical. And it is true that Defendants were not always successful in cancelling spoof orders quickly enough to avoid filling them. But, a reasonable jury could find,

based upon Defendants' repeated execution of the scheme along with the other trial evidence discussed above, that they acted "with the specific intent to deceive or cheat . . . for the purpose of getting financial gain for one's self." *See United States v. Faruki*, 803 F.3d 847, 853 (7th Cir. 2015); *cf. Connolly*, 24 F.4th at 839 ("[A] scheme need not succeed in order to violate § 1343"); *United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011) ("The wire fraud statute punishes the scheme, not its success.").[7]

Along similar lines, Defendants contend that there was insufficient evidence from which a rational jury could find that they possessed the requisite fraudulent intent with regard to the particular orders listed in Counts Four, Seven, Eight, Ten, and Nineteen. To the contrary, the government introduced evidence in the form of charts and underlying trading data to illustrate how the Subject Orders in these Counts adhered to Defendants' scheme of placing false orders to illegally manipulate market prices. *See* GX1.[8] To explain the scheme, the government relied on Sniegowski and Lakhan. Tr. at 221:13–227:9, 652:15–665:1; *see also* Tr. at 601:22–

---

[7]      In all of the ways discussed, the weight of the government's evidence established that, during the trading episodes at issue, Defendants intended to cancel their visible orders that they placed on the opposite side of their iceberg orders. This is so, regardless of whether Defendants faced the risk that the scheme might not work. *See Aslan*, 644 F.3d at 545. Accordingly, Defendants' argument that the government's use of the terms "wanting," "willing," and "intending" interchangeably during closing argument risked jury confusion or was unfairly prejudicial is unpersuasive.

[8]      The charts and data included the orders identified in Count Four (Bases's 50 sell contracts in gold futures on September 24, 2010, at 8:13 a.m.), Count Seven (Bases's 50 sell contracts in gold futures on April 27, 2011, at 8:52 a.m.), Count Eight (Bases's 90 buy contracts in gold futures on August 17, 2011, at 2:28 p.m.), Count Ten (Bases's 50 buy contracts in gold futures on March 25, 2012 at 6:21 p.m.), and Count Nineteen (*e.g.*, Pacilio's 50 buy contracts in gold futures on January 24, 2014, at 9:44 a.m.; 100 buy contracts in gold futures on February 18, 2014, at 3:20 p.m.; 200 buy contracts in platinum futures on February 28, 2014, at 10:31 a.m.; 100 sell contracts for silver futures on September 15, 2014, at 1:15 p.m.; and 100 buy contracts for platinum futures on October 6, 2014, at 10:26 a.m.).

602:25, 664:19–665:1, 815:8–817:17 (observing first hand Defendants' fraudulent scheme). Even Pacilio recognized that another trader's use of the same manipulative scheme in 2013 and 2014, constituted "systematically spoofing the futures to buy or sell his 20 lots." *See* GX 130, Email From J. Pacilio to A. Sandhu (Apr. 30, 2015). A rational jury could easily have put two-and-two together by applying the scheme's pattern to the trading episodes depicted in the charts and data. Accordingly, Defendants' motions for an acquittal as to Counts Four, Seven, Eight, Ten, and Nineteen also are denied.

Lastly, Defendants contend that the government presented no evidence of motive. But this too is incorrect. As Lakhan testified, spoofing helps a trader place a client's orders quickly and at a favorable price. "If you can execute – if you can trade the client at the price they want, then – and also quickly, it – you get more business from the client and information from the client by doing so." Tr. at 642:1–9. Indeed, according to Lakhan, Bases stressed that "you have to do anything you can to help keep clients, customers happy." *Id.* at 642:25–643:20. This is sufficient evidence from which a rational jury could find motive.

For these reasons, to the extent that Defendants' motions for a judgment of acquittal are premised on the insufficiency of the trial evidence, the motions are denied.

## 2. Whether Wire Fraud Statute Is Unconstitutionally Vague

Defendants also reprise their argument that the wire fraud statute is unconstitutionally vague as applied to their conduct. In Defendants' view, the trial

confirmed that Section 1343's prohibition against "any scheme or artifice to defraud" or "false or fraudulent pretenses, representations, or promises" failed to provide sufficient notice to the public that placing orders in the market with an intent to cancel was illegal. The Court already rejected this argument, *see United States v. Bases*, No. 18 CR 48, 2020 WL 2557342, at *11–13 (N.D. Ill. May 20, 2020), and nothing at trial changes this view.

The Seventh Circuit's recent decision in *United States v. Chanu* is instructive. There, the defendants were convicted under the wire fraud statute for engaging in conduct substantially identical to that at issue here. They too argued that the wire fraud statute did not prohibit them from placing orders in the futures market with the intent to cancel, because the orders were executable. The Seventh Circuit was unpersuaded. Citing *Neder v. United States,* 527 U.S. 1, 23–25 (1999), and *Emery v. American General Finance*, 71 F.3d 1343, 1348 (7th Cir. 1995), for the well-established proposition that the federal wire fraud statute outlaws fraudulent omissions and half-truths, as well as misrepresentations, the court held that the defendants, "[b]y obscuring their intent to cancel, through an orchestrated approach, . . . had advanced a quintessential 'half-truth' or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in the hopes of financial gain." *Id.* Such conduct, the Seventh Circuit concluded, fell squarely within the prohibitions expressed in § 1343.

The court in *Chanu* had little trouble determining that placing orders in the futures market with a coincident intent to cancel them was outlawed by the federal

wire fraud statute. And, given the rule espoused in *Neder* and *Emery*, this comes as no surprise. The language of § 1343 provides more than sufficient notice that Defendants' conduct was illegal. Thus, Defendants' motions for a judgment of acquittal based on the theory of unconstitutional vagueness is denied.

For all of the reasons discussed, Defendants' Rule 29 motions for a judgment of acquittal are denied.

## B. Rule 33 Motions for a New Trial

In the alternative, Defendants request a new trial under Rule 33. That rule allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While Rule 33 does not define "the interest of justice," "courts have interpreted the rule to require a new trial . . . in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006).

Rule 33 permits a court to "reweigh the evidence, taking into account the credibility of the witnesses." *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999). But "[i]n general, conflicting testimony or a question as to the credibility of a witness [is] not [a] sufficient ground[] for granting a new trial." *Kuzniar*, 881 F.2d at 470. Instead, such testimony must be "contrary to the laws of nature or otherwise incapable of belief." *Washington*, 184 F.3d at 657.

19

Furthermore, a court may not vacate a judgment and grant a new trial unless "the verdict is so contrary to the weight of evidence that a new trial is required in the interests of justice." *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). Whether to vacate a judgment and grant a new trial falls within the sound discretion of the district court and should be exercised in "only the most 'extreme cases.'" *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (quoting *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998)).

### 1. Manifest Weight of the Evidence

Defendants first argue that the jury's verdict was so contrary to the weight of the evidence that a new trial is warranted. In their view, the government presented only minimal evidence supporting its theory that placement of an order on the CME with the intent to cancel was an implied misrepresentation prohibited by § 1343. Defendants also contend that there was little to no evidence to support a verdict beyond a reasonable doubt that they had acted with the necessary intent to defraud. These arguments are unpersuasive. Given all of the incriminating testimony and the exhibits described above, the Court concludes that the jury's verdict was supported by enough evidence so that a new trial is not warranted under Rule 33.

### 2. Government's Use of the Term "Market Manipulation"

Next, in Defendants' view, the government's use of the term "market manipulation" during the trial tainted their right to a fair trial. This is especially so, they say, because the Court denied their request for a curative instruction to ensure that the jury understood that Defendants were not being charged with market

manipulation under the Commodities Exchange Act ("CEA"), specifically 7 U.S.C. § 9 and 7 U.S.C. § 13(a)(2).

As the Court previously explained, however, there was little to no risk that the jury would have confused the government's use of the word "manipulate" in its common, everyday meaning with the term "market manipulation" as used in § 9 and § 13(a)(2). *See United States v. Coscia*, No. 14-cr-551, 2015 WL 6153602, at *3 (N.D. Ill. Oct. 19, 2015) (denying motion to exclude references to "manipulation" and stating that "[t]he term 'manipulation,' when used in the ordinary, nonlegal sense that the Government describes, is not unfairly prejudicial."). Indeed, from the outset, the government expressly defined for the jury what it meant by the term "manipulate."

> Ladies and gentlemen, good morning. You have before you two bankers. These two bankers manipulated the market prices of gold and silver. They pushed those prices up and they pushed those prices down with orders to buy and sell, orders that they knew sent fake signals to the market about supply and demand.

Tr. at 3:7–12. And Defendants have not cited a single instance in which the government, its witnesses, or exhibits referenced § 9 or § 13(a)(2) at all.

Because the jury would not have confused the government's use of the term "manipulation" with the term "market manipulation" as defined under 7 U.S.C. § 9 and 7 U.S.C. § 13(a)(2), Defendants' proposed curative instruction was unnecessary. To the contrary, mentioning those other offenses to the jury, when the government had not charged Defendants with violating them, likely would have confused the jury,

rather than assisted it. Accordingly, the government's use of the phrase "market manipulation" or "manipulate" before the jury does not warrant a new trial.[9]

### 3.    CME Rule 432

Defendants also argue that they were unduly prejudiced by the admission of the text of CME Rule 432, as well as the testimony of Sniegowski, Lakhan, Pettey, and Twells regarding their understanding of the rule. The government's aim in introducing this evidence was to establish that Defendants were on notice that their conduct was prohibited.[10] During a final pretrial conference, Defendants argued that the rules of the CME, specifically Rule 432, were ambiguous and did not address or prohibit the conduct at issue. *See* Hr'g Tr. at 240:8–14, ECF No. 596 (July 7, 2021). The Court agreed that Rule 432 was ambiguous and allowed the parties to introduce

---

[9]    Nor would a reasonable jury have been confused regarding whether evidence of manipulating or spoofing the market, in and of itself, was enough to convict either Defendant of conspiracy to commit wire fraud, wire fraud, or commodities fraud. The Court instructed the jury:

> Evidence that a defendant engaged in spoofing . . . is not sufficient, in and of itself, to find a defendant guilty of conspiracy to commit wire fraud, wire fraud, or commodities fraud. Rather, the government must prove all of the elements of conspiracy to commit wire fraud, wire fraud, or commodities fraud beyond a reasonable doubt in order to find a defendant guilty on each of those charges.

Final Jury Instructions at 37, ECF No. 623. Accordingly, the Court rejects Defendants' arguments otherwise.

[10]    To avoid any jury confusion, the Court instructed the jury that "[e]vidence that a defendant . . . violated an exchange rule or any bank policy is not sufficient, in and of itself, to find a defendant guilty of conspiracy to commit wire fraud, wire fraud, or commodities fraud." Final Jury Instructions at 37.

evidence as to how participants in the commodities futures industry commonly interpreted it. *Id.* at 239:17–23.[11]

At trial, Sniegowski testified that, as CME's Executive Director of Rules and Regulatory Outreach, he was familiar with Rule 432, which existed when he joined the CME in 1989. Tr. at 216:22–25, 233:15–18. He opined that, based on his experience, Rule 432's prohibition against "engag[ing], or attempt[ing] to engage, in fraud or bad faith" and "conduct or proceedings inconsistent with just and equitable principles of trade" encompassed the practice of placing orders with the intent to cancel them. *Id.* at 235:14–236:22. Sniegowski also stated that the CME expects its market participants to know the rules to ensure market integrity. *Id.* at 233:3–9.

In addition, Lakhan, Pettey, and Twells testified that, during the relevant period, they as commodities futures traders understood that placing an order on the CME with the intent to cancel was against the rules. Tr. at 855:12–15 (Lakhan), 1424:5–17 (Pettey), 1577:9–25 (Twells). According to Lakhan, he knew that doing so was wrong because it inserted false information into the market and harmed other traders. Tr. at 598:7–12, 599:23–600:8, 601:22–604:4. Although Lakhan, Pettey, or Twells did not specifically cite Rule 432 as the source of their understanding, their

---

[11] Defendants argue that, in general, parol evidence should have been excluded precisely because the Court held Rule 432 was ambiguous. Defendants do not explain why. Nor do they cite any case law to support this proposition. Thus, the argument is deemed waived. *See United States v. Davis*, 29 F.4th 380, 385 n.2 (7th Cir. 2022) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." (cleaned up)). But even if it weren't, to the extent that Bases and Pacilio were aware of the rule and understood its meaning, such facts would be relevant to their intent.

unequivocal testimonies that they knew spoofing was forbidden on the CME were probative of whether Bases and Pacilio also were aware of the prohibition.

The cases Defendants cite provide them no aid. Defendants first rely on *United States v. Chandler*, 388 F.3d 796, 802 (11th Cir. 2004). There, the defendants were charged with mail fraud for fraudulently representing to McDonald's Corporation that they were legitimate winners of certain promotional games, when, in reality, they had received the playing stamps from someone who had stolen them. The Eleventh Circuit held that, because the game rules did not explicitly prohibit receiving game stamps from someone else (indeed, a McDonald's representative testified that game players could transfer stamps to anyone), and there was no evidence that the defendants knew their stamps had been stolen, the government had failed to prove that the defendants had made any intentional misrepresentations to the company. *Id.* at 804–05.

Defendants also cite *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008). In that case involving securities fraud, the Second Circuit affirmed the district court's grant of a motion for acquittal on the grounds that an implied representation arising from exchange rules was insufficient, in and of itself, to establish fraud where the government failed to present evidence of a "material misrepresentation," "omission," or "creation of a false appearance of fact" "by any means." *Id.* at 151.

Both *Chandler* and *Finnerty* are readily distinguishable. In those cases, the government presumed that a violation of a rule alone was sufficient to establish intent. By contrast, here, the government presented witnesses and documents

indicating that Bases and Pacilio knew that the Subject Orders were prohibited and conveyed false information to the market. All of this evidence was highly probative of their criminal intent and substantially outweighed any prejudice to Defendants. Accordingly, Defendants' motion for a new trial on this ground is denied.

### 4. Lay Opinions Regarding Bank Policies

In a similar vein, Defendants object to the testimony from bank representatives that their respective financial institutions forbade placing orders with the intent to cancel, claiming that this information was never conveyed to them. But the bank officials testified that the traders at their respective banks were expected to understand and adhere to bank policies. Tr. at 1108:14–25 (Bases at Deutsche Bank), 1239:14–1240:25 (Bases at Bank of America), 1242:12–1243:1 (Pacilio at Bank of America); 1277:23–1279:11 (same), 1287:2–7 (same). Moreover, the officers pointed to exhibits demonstrating that the banks had notified each Defendant of these policies in emails and during training programs. *See, e.g.,* Tr. at 1109:6–15 (Bases at Deutsche Bank), 1109:23–1114:22 (same), 1293:3–1295:25 (Bases at Bank of America), 1279:20–23 (Pacilio at Bank of America), 1286:15–1287:1 (same), 1288:10–1289:17 (same), 1291:4–1292:24 (same).

Given this, the testimony from the bank officers that their respective banks prohibited the conduct at issue and that the banks had informed Defendants of these policies also was probative of Defendants' knowledge and intent and substantially outweighed any undue prejudice to Defendants.

### 5. Lakhan's Testimony Regarding Three Trades

Next, Defendants contend that Lakhan's testimony about three specific trading episodes on August 20, 2009, November 20, 2009, and November 16, 2010, as well as the contemporaneous online chat messages that accompanied them, exceeded the bounds of his personal knowledge and, therefore, was unfairly prejudicial. This argument is contrary to the record.

The evidence demonstrates that Lakhan was involved in the three chats in question. As to the online chat between Nick Green and Pacilio on August 20, 2009, Lakhan provided documentation that he himself was logged into the chat. Tr. at 743:24–747:23; *see* GX 54. Likewise, Lakhan discussed a chat between Amrik Sandhu and Pacilio on November 20, 2009, and noted that he participated in that chat session as well. Tr. at 693:6–695:1; *see* GX 57. Finally, Lakhan talked about a chat between Amrik Sandhu and Bases on November 16, 2010, during which time he too was logged into the chat. *See* Tr. at 742:22–743:6; *see* GX 78. Lakhan was an online participant in each of these chats and, thus, was competent to describe his understanding as to the contents of the chats. Moreover, his observations were probative of Defendants' intent and their probative value outweighed any undue prejudice to Defendants. Accordingly, this argument too fails.

### 6. Exclusion of Evidence as to Bases's Good Faith

Defendants also assert that they were unjustly prejudiced when the Court precluded the introduction of certain evidence relevant to Bases's purported state of mind. Specifically, Defendants point to excluded portions of DX 76—an online chat

on July 23, 2013, between Bases and another trader in which Bases states, "Both orders were good," "Both sides were tradeable," "It's not like they were false orders," and "They were real orders." Defendants also highlight excluded statements in DX 103 and DX 131—an audio recording and transcript of a March 13, 2015, conversation between Bases and a former customer in which Bases stated "four or five years ago . . . if I had an offer, I would show a bid, and I'm happy to trade on either side. . . . both orders are good.'" *Id.* The problem with these statements is that they are hearsay. And Defendants were offering them to prove the truth of the matters asserted therein, *i.e.*, that the orders at issue of "were good," "were tradeable," were not "false orders," and "were real orders."

What is more, these statements failed to meet the state-of-mind exception under Federal Rule of Evidence 803(3). In order to qualify, "the statement must be contemporaneous with the mental state sought to be proven"; "it must be shown that declarant had no time to reflect, that is, no time to fabricate or misrepresent his thoughts"; and "the declarant's state of mind must be relevant to an issue in the case." *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992).

None of Bases's statements were made contemporaneously with the placement or execution of the orders referenced in them. Nor did Defendants show that Bases lacked the opportunity to reflect on those orders or to fabricate or misrepresent his thoughts about them. In fact, Bases made some of the statements an entire day after he had received an email from a colleague informing him of the civil enforcement actions brought against Michael Coscia for the same conduct. *Compare* DX 110, *with*

DX 76; *see United States v. Carter*, 910 F.2d 1524, 1530–31 (7th Cir. 1990) (finding Rule 803(3)'s contemporaneousness requirement unsatisfied where the statement at issue was made "at least an hour after [the defendant] had confessed" because "[s]uch a time period provided defendant with ample opportunity to reflect upon his situation"). The other conversation between Bases and a former customer occurred on March 13, 2015, over a year after Bases had ceased his trading scheme. *Compare* GX1, at #43b, *with* DX 103. Because the contested statements in DX 76, DX 103, and DX 131 fail to satisfy the requirements of the state-of-mind exception to the hearsay rule, their exclusion does not provide a basis for a new trial.

### 7. *Weimert* instruction

As a final point, Defendants argue the Court's rejection of their proposed jury instruction, which was based on *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016), deprived them of a fair trial. The proposed instruction provides:

> Deception about negotiating positions is not material for purposes of the federal fraud statutes. Where a buyer is not misled as to the nature of the asset it was buying or the consideration received, there is no fraud. Deception about a party's negotiating position is deception about that party's preferences and values, and therefore cannot be material.

Proposed Jury Instructions at 23, ECF No. 489-1.

In *Weimert*, a cash-strapped bank that needed to sell the bank's share in a real estate development tasked its vice president to negotiate the sale. 819 F.3d at 353. In a series of negotiations over the course of several months, the vice president misled the bank and the buyers into believing that the deal would not close unless he was

given a minority interest in the real estate development. *Id.* The government charged the vice president with wire fraud, and a jury found him guilty. *Id.*

The defendant filed a motion for acquittal, and the district court denied it. The Seventh Circuit reversed, holding that the defendant's deceptive statements about the contracting parties' negotiating positions were customary and harmless and, therefore, did not amount to a scheme to defraud under the wire fraud statute. *Id.* at 357–58. In arriving at this conclusion, the court noted that there was "no evidence that Weimert misled anyone about any material facts." *Id.* at 354. At the same time, the court emphasized that "[s]ome deceptions in commercial negotiations certainly can support a . . . wire fraud prosecution. A party may not misrepresent material facts about an asset during a negotiation." *Id.* at 356.

By contrast, the evidence at trial showed that Defendants' placement of orders on the exchange with the intent to cancel them conveyed false information that was material to the other market participants. Nor were such orders customary in the industry or harmless. In fact, the trial evidence demonstrated that the opposite was true. *See, e.g.*, *Chanu*, 40 F.4th at 542. As such, the instruction Defendants proposed was unnecessary and unsuited to the evidence in this case. If anything, it likely would have confused the jury rather than assisting it.

In sum, the verdict in this case is not contrary to the manifest weight of the trial evidence. Nor is there a reasonable possibility that a legal error committed during the trial had a prejudicial effect on the verdict. Accordingly, Defendants' Rule 33 motions for a new trial are denied.

### IV.    Conclusion

For the above reasons, Defendants' motions for a judgment of acquittal or, in the alternative, for a new trial are denied.

**IT IS SO ORDERED.**                    **ENTERED:   8/22/22**

_____
**JOHN Z. LEE**
**United States District Judge**